

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ZAPOLSKI / RUDD, LLC,

                                    Plaintiff,

            -against-                                        **COMPLAINT**

THE SETAI GROUP, LLC, JOHN P. CONROY and
JONATHAN J. BREENE,

                                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

      Plaintiff Zapolski & Rudd, LLC ("Z&R" or "plaintiff"), as and for its Complaint

against defendants The Setai Group, LLC ("Setai"), John P. Conroy and Jonathan J.

Breene (collectively "defendants") states as follows:

### NATURE OF ACTION

      1.    This action arises from defendants' breach of the terms of the parties'

Settlement Agreement in the prior action, *Zapolski/Rudd LLC v. The Setai Group, LLC,*

*et al.,* 06 Civ. 6353 (WHP)(AJP)(the "Prior Action"), a copy of which is attached as

Exhibit A hereto.

### THE PARTIES

      2.    Z&R is a limited liability company organized and existing under the laws

of North Carolina, with its principal place of business located at 501 Washington Street,

Durham, North Carolina 27701.

      3.    Setai is a limited liability company organized and existing under the laws

of New York, with its principal place of business located at 405 Lexington Avenue, New

York, New York 10174.

4.      John P. Conroy is a principal of Setai and a resident and citizen of New York.

5.      Jonathan J. Breene is a principal of Setai and a resident and citizen of Florida.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) in that there is complete diversity of citizenship between the parties and the amount in controversy, exclusive of interest and costs, exceeds the sum of $75,000.

7.      Venue is proper in the Southern District of New York pursuant to 28 U.S.C. §§ 1391(a) and (c) because Setai and Conroy are subject to personal jurisdiction in this District, and a substantial part of the events giving rise to the claims occurred within this District.

8.      Venue and jurisdiction over this action which seeks enforcement of the Settlement Agreement is also proper in this Court as it expressly retained jurisdiction over enforcement of the Settlement Agreement. *See* Exhibit A, Civil Judgment (A.J. Peck, U.S.M.J.), entered November 7, 2007 ("This action is dismissed without prejudice and without costs, but the Court retains jurisdiction pursuant to the terms of the Settlement Agreement.)."

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

9.      Pursuant to the Letter Agreement entered into between ZR and Setai, ZR placed a $1 million deposit (the "Deposit") in escrow in connection with Setai's planned acquisition of a hotel property in Miami, Florida from sellers called the "Brodsky Group."  The Letter Agreement is attached as Exhibit B hereto.

10. Setai's Purchase and Sale Agreement with the Brodsky Group is attached as Exhibit C hereto.

11. The Letter Agreement between ZR and Setai provides that ZR had the absolute right to terminate its involvement in the deal. Upon ZR's notice of termination, Setai had two choices: (i) Setai could decide to terminate its own involvement in the transaction and instruct the Brodsky Group to return the $1 million Deposit, which the Letter Agreement calls a "Termination Decision"; or (ii) Setai could decide to proceed with the acquisition without ZR and otherwise reimburse ZR from separate funds the $1 million Deposit, which the Letter Agreement calls a "Go Forward Decision."

12. In the event of a Termination Decision, the Letter Agreement obligated Setai to pay to ZR $500,000 by no later than 21 business days after the initial closing date of March 20, 2006, namely April 18, 2006. Upon payment of the $500,000, the parties would then jointly pursue the Brodsky Group for return of the $1 million Deposit, which they would equally share, thereby making ZR whole.

13. In the event of a Go Forward Decision, Setai was obligated to reimburse the full $1 million Deposit to ZR by April 18, 2006, and to also pay to ZR an additional $300,000 fee.

14. Most of Setai's payment obligations under the Letter Agreement were unconditionally guaranteed by Setai's principals Conroy and Breene pursuant to their personal Guarantees collectively attached as Exhibits D hereto.

15. On March 6, 2006, ZR timely provided notice to Setai of its election to terminate its involvement in the deal, thereby triggering Setai's obligation to make either a Termination Decision or a Go Forward Decision. A copy of the March 6, 2006 Notice

is attached as Exhibit E. Setai did neither. Instead, on May 22, 2006, Setai sent a letter to ZR stating that although it believed that the Brodsky Group failed to satisfy all of its obligations under the Purchase and Sale Agreement, Setai was otherwise attempting to broker a transaction between a new possible purchaser and the Brodsky Group. A copy of this letter is attached as Exhibit F.

16.     On May 31, 2006, ZR sent defendants another default notice (Exhibit G hereto). On June 1, 2006, Setai sent the Brodsky Group a request for the return of the Deposit, but otherwise made clear that it remained committed to pursuing the transaction (Exhibit H hereto).

17.     On August 21, 2006, ZR commenced the Prior Action against Setai and the Guarantors for breach of the Letter Agreement and the Guarantees.

18.     On October 2, 2006, Setai commenced an action against the Brodsky Group for the return of the $1 million deposit in Florida State Court (the "Brodsky Litigation").

19.     On November 7, 2007, the parties appeared before Magistrate Judge Peck for a Court Ordered Settlement Conference in the Prior Action.

20.     With the assistance of the Court, the parties reached an agreement and settled the Prior Action pursuant to the terms of the Settlement Agreement which were recorded by the Court.

21.     The Settlement Agreement obligated defendants to: (i) make installment and balloon payments to ZR of $570,000 plus 9% interest; and (ii) to deliver an additional $500,000 to ZR upon defendants' recovery of any sum from the Brodsky Group in connection with the Brodsky Litigation.

22.    As for the first part of the settlement amount, the Settlement Agreement

provides:

> The defendants will pay the sum of $570,000 plus interest on that amount
> from today forward at 9 percent interest on the following terms and with the
> following guarantees:
>
> $25,000 will be paid each month beginning on January 1, 2008, with the balance
> to be paid on or before October 31, 2008. The parties agree that a judgment will
> be entered immediately against the Setai Group's 40 Broad special-purpose entity,
> the formal corporate name of which is SG 40 Broad LLC, in the amount of $1
> million. All these amounts are plus interest at 9 percent from today forward.
> Setai Group LLC will sign a confession of judgment to be held in escrow by Mr.
> Lesser as counsel for plaintiff in the amount of $1 million plus interest, and the
> individual guarantors, Mr. Conroy and Mr. Breene, will sign confessions of
> judgment for $570,000 plus further interest.
>
> In the event of the failure to pay any of the $25,000 monthly payments or the
> failure to pay the final balloon payment on October 31, 2008, that will bring all
> payments up to the amount of $570,000 plus the 9 percent interest, then all
> amounts due and outstanding up to the sum of $1 million minus amounts
> already paid plus interest will be immediately due and owing, provided,
> however, that in the event of any of the $25,000 payments if not made on the
> first of each month starting January 1, 2008 and when such days are, as it is on
> January 1, on a holiday or weekend, the next business day, plaintiffs shall give
> defendants notice and a three-day opportunity to cure said default. Failure to
> cure any such default means that the entire $1 million plus interest balance is
> then due and owing. The parties further agree that in the event of any failure to
> pay the full sum, whether by acceleration or through the October 31, 2008, date,
> plaintiff shall be entitled to attorney's fees for the costs of attorney's fees and
> costs for the cost of collecting the amounts due.

23.    Defendants delivered the required Affidavits in Support of Confession of

Judgment to ZR, copies of which are collectively attached as Exhibit I.

24.    With respect to the second part of the settlement amount – any money

defendants obtain from the Brodsky Group in connection with the Brodsky Litigation –

the Settlement Agreement provides:

> In the event that defendant Setai Group collects any of the $1 million
> deposit from the Brodsky entity, it will pay $500,000 of that immediately,
> within 21 days as called for by the letter agreement to the plaintiff, and that
> will reduce the $1 million amount at issue. In the event that that is not

collected before October 31, 2008, then the parties shall have their respective rights against each other pursuant to the letter agreement of January 17, 2006, Exhibit B to the complaint.

The parties further agree that this case will be dismissed without prejudice and that in the event all payments are made but the additional $500,000 due to the plaintiff from the Brodsky lawsuit, that there is a tolling agreement from now until 60 days after October 31, which I guess gets us to December 31, 2008, such that any claims any of the parties here may have against each other in connection with that Brodsky million dollar deposit, half of which is to be due to plaintiff, that will enable the plaintiff to bring a further action against the Setai Group, Conroy, and/or Breene pursuant to the letter agreement, Exhibit B to the complaint.

The parties further agree that the letter agreement, Exhibit B to the complaint, is modified to the extent of the paragraph under "Pursuit of Deposit" on page 2, eliminating the last line of that sentence, the line that currently reads "and share the cost of such pursuit on a 50/50 basis," it being understood that defendants will be solely responsible for the cost of the pursuit of the Brodsky group, but that all other rights and obligations as between Zapolski/Rudd and Setai Group remain pursuant to that letter agreement.

25.    This provision requires that in the event defendants collect any of the $1 million Deposit from the Brodsky Group, defendants are then obligated to immediately deliver $500,000 of that amount to ZR.  The Settlement Agreement further provides that defendants are solely responsible for the cost of the pursuit of the return of the $1 million Deposit from the Brodsky Group.

26.    On April 11, 2008, defendants and the Brodsky Group agreed to settle the Brodsky Litigation for $375,000, which payment was received by defendants' Florida counsel, Mitrani Rynor & Adamsky, P.A. ("Mitrani"), on April 18, 2008.

27.    Defendants settled for only 37.5¢ on the dollar because of the Brodsky Group's evidence that defendants waived their right to pursue recovery of the $1 million Deposit, including the transcript of a voice mail message dated June 1, 2006 from

6

defendants' representative Kevin Fallon to the Brodsky Group's representative (Exhibit J hereto), which states:

> Hey Ken, it's Ken Fallon from Setai Group. Ah I don't know if John told you I think he did tell you that we were going to be sending you a letter today asking for a return of the deposit. [I] just wanted to touch base with you letting you know that [it] was coming. And I'm sure John explained it to you that you know [it is] not really from us [] or at all from us as it is from [Z&R] who is you know breathing down our necks and forcing us to send the letter because we are the party to the contract as is the case rather than having a [joint venture] that is a party to the contract so [] we are sending that letter sort of on behalf of [Z&R] so don't take it the wrong way, but we sort of have to send it to prevent [Z&R] from taking action against us so I'm just going to fire that off by e-mail now and I'll send it by hard copy as well. But ah any questions please do give me a call.

28.    While defendants' business decision to settle the Brodsky Litigation for only $375,000 was their own to make, because it was for less than $500,000, the entire $375,000 amount must be paid over to ZR pursuant to the Settlement Agreement which provides that: "[i]n the event that defendant Setai Group collects any of the $1 million deposit from the Brodsky entity, it will pay $500,000 of that immediately, within 21 days as called for by the letter agreement to the plaintiff [ZR], and that will reduce the $1 million amount at issue."

29.    Nonetheless, on April 16, 2008, Mitrani filed a "charging lien" of $156,904.84 against the $375,000 Brodsky Group settlement payment.

30.    After being informed of this "charging lien," ZR requested assurances from defendants that the full $375,000 would be paid over to ZR notwithstanding Mitrani's "charging lien."

31.    Defendants initially refused to provide such assurances, and instead indicated that ZR had no right to object to the amount of defendants' settlement with the

Brodsky Group, nor defendants' plan to pay Mitrani's outstanding legal bills of $156,904.84 from the $375,000 settlement proceeds.

32.    However, by making the business decision to settle with the Brodsky Group for less than the $500,000 defendants are required to immediately pay over to ZR, defendants foreclosed any ability to deduct any portion of their legal fees from the $375,000 settlement proceeds because the Settlement Agreement expressly provides that: "Defendants will be solely responsible for the cost of the pursuit of the Brodsky Group."

33.    Defendants have since indicated that they intend to discharge Mitrani's "charging lien," and deliver the $375,000 to ZR, but have refused to provide any assurances as to when such funds will be delivered to ZR.

34.    Pursuant to the Settlement Agreement, defendants had 21 days to deliver the $375,000 settlement proceeds to ZR upon receipt of such funds from the Brodsky Group.

35.    As defendants' counsel Mitrani received and deposited the $375,000 payment on April 18, 2008, defendants' 21-day period to delivery such funds to ZR ran on Friday, May 9, 2008.

36.    Defendants did not make the required payment to ZR, nor have indicated when such payment will be made, thereby forcing plaintiff to commence this Action for defendants' breach of the Settlement Agreement.

### FIRST CAUSE OF ACTION
(Breach of the Settlement Agreement)

37.    Plaintiff repeats and realleges the allegations set forth above.

38.    The Settlement Agreement is a binding and enforceable contract.

39.     Plaintiff has performed all of its obligations under the Settlement Agreement.

40.     The Settlement Agreement provides that: "In the event that defendant Setai Group collects any of the $1 million deposit from the Brodsky [Group], it will pay $500,000 of that immediately, within 21 days as called for by the letter agreement to the plaintiff, and that will reduce the $1 million amount at issue."

41.     The Settlement Agreement also provides that: "Defendants will be solely responsible for the cost of the pursuit of the Brodsky Group."

42.     In breach of these provisions of the Settlement Agreement, defendants have failed to deliver to plaintiff the $375,000 proceeds received from the Brodsky Group on April 18, 2008.

43.     As a result of defendants' breach of the Settlement Agreement, plaintiff has been damaged in the amount of $375,000, exclusive of interest, costs, fees, and expenses.

## SECOND CAUSE OF ACTION
(Breach of the Letter Agreement)

44.     Plaintiff repeats and realleges the allegations set forth above.

45.     The Letter Agreement is a binding and enforceable contract.

46.     Plaintiff has performed all of its obligations under the Letter Agreement.

47.     On March 6, 2006, plaintiff timely provided notice to Setai of its election to terminate its involvement with the property acquisition, thus satisfying all conditions precedent to termination pursuant to the "ZR Termination Rights" paragraph of the Letter Agreement.

48.    Once plaintiff issued its March 6, 2006 termination notice, Setai was obligated to make either a Termination Decision or Go Forward Decision.

49.    Setai did neither.

50.    On May 31, 2006, Z&R sent Setai default notice (Exhibit G hereto). On June 1, 2006, defendants sent the Brodsky Group a request for the return of the Deposit, but otherwise made clear that it remained committed to pursuing the transaction (Exhibit H hereto).

51.    Unbeknownst to plaintiff, defendants otherwise qualified the terms of its June 1, 2006 letter to the Brodsky Group by stating that the demand was only sent to avoid litigation from plaintiff, and implying that it would not actually be pursued.

52.    By and through such conduct, defendants gave the Brodsky Group the ability to argue that defendants waived their right to secure return of the $1 million Deposit, which led the court in the Brodsky Litigation to deny defendants' motion for summary judgment for return of the $1 million Deposit.

53.    As a result of defendants' deliberate decision to send mixed messages to the Brodsky Group, defendants forfeited their ability to obtain summary judgment against the Brodsky Group for the recovery of the $1 million Deposit.

54.    The Court in the Brodsky Litigation expressly determined that an issue of fact was created by defendants' conduct and "mixed messages" that negated their right to obtain judgment as a matter of law on their claim for return of the $1 million Deposit.

55.    Following the court's denial of defendants' motion for summary judgment in the Brodsky Litigation, defendants chose to settle the Brodsky Litigation for only $375,000.

56.     Defendants' deliberate decision to send mixed messages to the Brodsky Group constituted a breach of the Letter Agreement which required defendants to pursue in good faith the immediate return of the $1 million Deposit on behalf of Z&R upon making a timely Termination Decision.

57.     As a result of defendants' breach of the Letter Agreement, plaintiff has been damaged in the amount of $125,000 in addition to the damages caused by defendants' failure to timely remit the $375,000 as set forth in the First Cause of Action, exclusive of interest, costs, fees, and expenses.

### THIRD CAUSE OF ACTION
(Declaratory Relief - Acceleration of the other Settlement Payments)

58.     Plaintiff repeats and realleges the allegations set forth above.

59.     An actual controversy exists between plaintiff and defendants.

60.     By breaching the terms of the Settlement Agreement, defendants are no longer entitled to the benefits of the payout provisions of the Settlement Agreement with respect to the first $570,000 of the settlement amount, plus interest.

61.     As a result of defendants' breach of the Settlement Agreement, plaintiff seeks permission to immediately file the Affidavits in Support of Confession of Judgment delivered to plaintiff pursuant to the Settlement Agreement, and enter Judgment against all three defendants for the full amounts confessed, in addition to interest, costs, and attorneys' fees as provided in the Settlement Agreement.

WHEREFORE, plaintiff Zapolski & Rudd, LLC demands Judgment against defendants The Setai Group, LLC, John P. Conroy and Jonathan J. Breene as follows:

(a)     A declaration that defendants have breached the terms of the Settlement Agreement;

11

(b)    Judgment against The Setai Group, LLC for the amount of $1 million,

plus interest, costs, and attorneys fees as provided by the Settlement Agreement, less the

amount installment payments defendants have made to date of Judgment;

(c)    Judgment against John P. Conroy for the amount of $570,000, plus

interest, costs, and attorneys fees as provided by the Settlement Agreement;

(d)    Judgment against Jonathan J. Breene for the amount of $570,000, plus

interest, costs, and attorneys fees as provided by the Settlement Agreement; and

(e)    Such other and further relief the Court deems just and proper.

Dated: New York, New York
      June 16, 2008

                        SIMON·LESSER PC

                        By: _____
                              Leonard F. Lesser, Esq.
                        420 Lexington Avenue
                        New York, New York 10170
                        t: 212.599.5455
                        f: 212.599.5459
                        Attorneys for plaintiff Zapolski/Rudd, LLC

# FAX TRANSMITTAL SHEET



## ANDREW J. PECK
## UNITED STATES MAGISTRATE JUDGE
## UNITED STATES DISTRICT COURT
### Southern District of New York
### United States Courthouse
### 500 Pearl Street, Room 1370
### New York, N.Y. 10007-1312

Fax No.:          (212) 805-7933
Telephone No.:   (212) 805-0036

Dated:  __November 7, 2007__                    Total Number of Pages:  __3__

| TO | FAX NUMBER |
|---|---|
| Leonard F. Lesser, Esq. | 212-599-5459 |
| James W. Kennedy, Esq. | 212-248-0170 |

# TRANSCRIPTION:

**MEMO ENDORSED 11/7/07**

**Approved.  This letter and defense counsel's 11/6/07 letter attached, combined with the 11/5/07 settlement conference transcript, constitutes a binding Settlement Agreement.**

Copy to:    Judge William H. Pauley III

NOV. 7. 2007  3:18PM    SIMON LESSER PC    HON ANDREW J PECK SDNY Fax:212 7933    Nov 7 2007 04:11pm P002/003
NO. 939  P. 2

# SIMON▪LESSER PC

Leonard F. Lesser
212.599.0360
llesser@simonlesser.com

Simon▪Lesser PC
Counsellors at Law
420 Lexington Avenue
New York, New York 101
T: 212.599.5455
F: 212.599.5459
www.simonlesser.com

RECEIVED
NOV 07 2007
CHAMBERS OF
ANDREW J PECK

November 7, 2007

**By Fax: 212.805.7933**

Hon. Andrew J. Peck
United States Magistrate Judge
United States Courthouse
500 Pearl Street
New York, New York 10007

Re:    *Zapolski/Rudd LLC v. The Setai Group, et al.*, 06 Civ 6353 (S.D.N.Y.)(WHP)(AJP)

Dear Magistrate Judge Peck:

We have reviewed the disclosures made by defendants in their counsel's letter submitted to the Court yesterday afternoon. During our call with the Court following receipt of the letter, defendants' counsel further represented that although SG 40 Broad LLC will not be receiving the licensing fees payable upon the closing of the condominium units in the Project, SG 40 Broad LLC nonetheless has an interest in the Project in that it will be operating the Project's Spa and Restaurant.

Based upon these representations, plaintiff Zapolski/Rudd LLC will proceed with the settlement negotiated with Your Honor's assistance in accordance with the terms transcribed at the close of the settlement Conference on Monday, November 5, 2007.

We thank you again for Your Honor's assistance in resolving this matter

Respectfully submitted,

Leonard F. Lesser

LL:yg

cc: James W. Kennedy (by e-mail)

**MEMO ENDORSED** 11/7/07

*[handwritten endorsement, illegible]*

SO ORDERED:

Hon. Andrew Jay Peck
United States Magistrate Judge

BY FAX

HON ANDREW J PECK SDNY Fax:212  -7933          Nov  7 2007 04:12pm  P003/003

# KennedyJohnsonGallagher LLC

99 Wall Street  |  15th Floor  |  New York, NY 10005

November 6, 2007
75-0002

jkennedy@kjglaw.com
Direct Dial: (212) 248-4830

**BY FACSIMILE (212) 805-7933**

The Honorable Andrew J. Peck
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Room 1370
New York, New York 10007

RE: *Zapolski / Rudd, LLC v. The Setai Group, et al.*, Index No. 06-CV-6353

Dear Judge Peck:

Our review of corporate documents reveals that our client, The Setai Group, LLC, was mistaken yesterday concerning the interest of SG 40 Broad LLC (the "SPE") in relation to the 40 Broad Street Project (the "**Project**"). While the SPE is indeed involved in the Project, it is not the entity that will be receiving the licensing fees that are payable upon the closing of the condominiums in the Project. We have relayed this information to plaintiff's counsel and we awaiting to hear whether plaintiff believes it will be necessary to restructure the settlement. We have advised Plaintiff's counsel, however, that The Setai Group is prepared to proceed with the settlement in its current form but asks that the Court give Plaintiff's counsel a reasonable opportunity to get back to us before the settlement is considered to be final.

Respectfully submitted,

*James Kennedy*

James W. Kennedy

cc:    Leonard Lesser, Esq. (via facsimile)
       *Counsel for plaintiff Zapolski/Rudd, LLC*

7B5NZAPN.txt

1

7B5NAZPN
1 UNITED STATES DISTRICT COURT
1 SOUTHERN DISTRICT OF NEW YORK
2 ------------------------------x
2
3 ZAPOLSKI RUDD, LLC,
3
4                    Plaintiff,         New York, N.Y.
4
5              v.                       06 Civ. 6353 (WHP)(AJP)
5
6 THE SETAI GROUP, LLC, et al.,,
6
7                    Defendants.
7
8 ------------------------------x
8
9                                      November 5, 2007
9                                      5:15 p.m.
10
10 Before:
11
11                    HON. ANDREW J. PECK,
12
12                                      U.S. Magistrate Judge
13
13                    APPEARANCES
14
14 SIMON LESSER PC
15      Attorneys for Plaintiff
15 BY:  LEONARD F. LESSER
16
16 KENNEDY JOHNSON GALLAGHER LLC
17      Attorneys for Defendants
17 BY:  JAMES W. KENNEDY
18      DEREK MCNALLY
18
19 ALSO PRESENT:  Brad Serwin
19                Jonathan J. Breene
20
21
22
23
24
25

              SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

2

7B5NAZPN
1         (In open court)
2         THE COURT:  We are on the record in the case of
3 Zapolski/Rudd LLC against the Setai Group LLC, John P.  Conroy
4 and Jonathan J. Breene, 06 Civ. 6353, to record the settlement
5 agreement that the parties have reached all afternoon with the
6 Court's assistance.
7         I will state the terms of the settlement as I
8 understand it.  I ask counsel to give me the universal sports
9 timeout signal if there's anything I get wrong or that needs to
10 be clarified off the record so you have the cleanest possible
11 record.
12         I ask the clients as well as counsel to pay careful
13 attention because at the end I am going to ask like at a
                    Page 1

7B5NZAPN.txt

14  wedding everybody to say their I-dos.  The parties have agreed
15  to amicably resolve this matter on the following terms:
16          The defendants will pay the sum of $570,000 plus
17  interest on that amount from today forward at 9 percent
18  interest on the following terms and with the following
19  guarantees:
20          $25,000 will be paid each month beginning on January
21  1, 2008, with the balance to be paid on or before October 31,
22  2008.
23          The parties agree that a judgment will be entered
24  immediately against the Setay Group's 40 Broad special-purpose
25  entity, the formal corporate name of which is SG 40 Broad LLC,
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

7B5NAZPN                                                           3

1   in the amount of $1 million.
2           All these amounts are plus interest at 9 percent from
3   today forward.
4           Setay Group LLC will sign a confession of judgment to
5   be held in escrow by Mr. Lesser as counsel for plaintiff in the
6   amount of $1 million plus interest, and the individual
7   guarantors, Mr. Conroy and Mr. Breene, will sign confessions of
8   judgment for $570,000 plus further interest.
9           In the event of the failure to pay any of the $25,000
10  monthly payments or the failure to pay the final balloon
11  payment on October 31, 2008, that will bring all payments up to
12  the amount of $570,000 plus the 9 percent interest, then all
13  amounts due and outstanding up to the sum of $1 million minus
14  amounts already paid plus interest will be immediately due and
15  owing, provided, however, that in the event of any of the
16  $25,000 payments if not made on the first of each month
17  starting January 1, 2008 and when such days are, as it is on
18  January 1, on a holiday or weekend, the next business day,
19  plaintiffs shall give defendants notice and a three-day
20  opportunity to cure said default.  Failure to cure any such
21  default means that the entire $1 million plus interest balance
22  is then due and owing.
23          The parties further agree that in the event of any
24  failure to pay the full sum, whether by acceleration or through
25  the October 31, 2008, date, plaintiff shall be entitled to
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

7B5NAZPN                                                           4

1   attorney's fees for the costs of attorney's fees and costs for
2   the cost of collecting the amounts due.
3           In the event that defendant Setai Group collects any
4   of the $1 million deposit from the Brodsky entity, it will pay
5   $500,000 of that immediately, within 21 days as called for by
6   the letter agreement to the plaintiff, and that will reduce the
7   $1 million amount at issue.
8           In the event that that is not collected before October
9   31, 2008, then the parties shall have their respective rights
10  against each other pursuant to the letter agreement of January
11  17, 2006, Exhibit B to the complaint.
12          The parties further agree that this case will be
13  dismissed without prejudice and that in the event all payments
14  are made but the additional $500,000 due to the plaintiff from
15  the Brodsky lawsuit, that there is a tolling agreement from now
16  until 60 days after October 31, which I guess gets us to
17  December 31, 2008, such that any claims any of the parties here
18  may have against each other in connection with that Brodsky
                            Page 2

7B5NZAPN.txt
```
19   million dollar deposit, half of which is to be due to
20   plaintiff, that will enable the plaintiff to bring a further
21   action against the Setai Group, Conroy, and/or Breene pursuant
22   to the letter agreement, Exhibit B to the complaint.
23            The parties further agree that the letter agreement,
24   Exhibit B to the complaint, is modified to the extent of the
25   paragraph under "Pursuit of Deposit" on page 2, eliminating the
```
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                                    5
7B5NAZPN
```
1    last line of that sentence, the line that currently reads "and
2    share the cost of such pursuit on a 50/50 basis," it being
3    understood that defendants will be solely responsible for the
4    cost of the pursuit of the Brodsky group, but that all other
5    rights and obligations as between Zapolski/Rudd and Setai Group
6    remain pursuant to that letter agreement.
7             The only condition to the settlement agreement is that
8    defendants shall have until 5:00 p.m. tomorrow to notify
9    plaintiff and the Court whether anything in connection with SG
10   40 Broad would prevent the entry of the judgment referred to
11   because it would cause a default or possible default of
12   agreements that SG 40 Broad has with lenders or other involved
13   parties.  In that case the parties will promptly negotiate a
14   substitute for that judgment, or the settlement agreement
15   disappears and the parties will resume litigation here.
16            If no notice is given to the plaintiff and the Court
17   by 5:00 p.m., the opt-out disappears and the matter is settled
18   and settlement is binding.
19            The Court will enter a judgment accordingly and a
20   dismissal accordingly.
21            It is further agreed that any such judgments,
22   confession of judgment, dismissals, etc., can be entered by me
23   pursuant to 28 U.S. Code Section 636(c), but that in the event
24   this settlement falls apart pursuant to the terms I've just
25   outlined, there is no such 636(c) consent unless the parties
```
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                                    6
7B5NAZPN
```
1    separately enter into one and the case will be returned to
2    Judge Pauley for a summary judgment motion and any other
3    proceedings that need to be had.
4             I think I've gotten everything, but let's go off the
5    record.
6             (Discussion off the record)
7             THE COURT:  The opt-out provision with respect to SG
8    40 Broad also is if the defense counsel in good faith believes
9    after examining all the interrelated corporate documents that
10   the entry of judgment against SG 40 Broad will result in a
11   default either of SG 40 Broad or of the Setai Group LLC under
12   any other loan or other obligations.
13            All right.  Back off the record.
14            (Discussion off the record)
15            THE COURT:  Mr. Lesser, as counsel of record for
16   Zapolski/Rudd LLC and subject to the assent of Mr. Serwin that
17   I will ask for in a moment, do you agree to the terms of the
18   settlement?
19            MR. LESSER:  I do, your Honor.
20            THE COURT:  Mr. Serwin, you are general counsel to the
21   Zapolski/Rudd group, correct?
22            MR. SERWIN:  I am, your Honor.
23            Before I answer I would like to also be able to check
```
                              Page 3

```
                              7B5NZAPN.txt
24    a couple of documents and have the same notice rights until
25    5:00 tomorrow.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```
                                                                        7
```
      7B5NAZPN
 1              THE COURT:  Any objection?
 2              MR. KENNEDY:  We have no objection, your Honor.
 3              We would just like to know what they are so we know
 4    parameters we are dealing with.
 5              MR. SERWIN:  It is actually the document between
 6    Zapolski and Rudd and make sure that I have authority to enter
 7    into the settlement without controversy between the two
 8    parties.  I believe I do.  That is what I came here with.
 9              THE COURT:  The more caveats there are -- I tried to
10    keep the defendants as narrow and checkable as possible.  The
11    more this becomes everybody has until 5:00 tomorrow to change
12    their mind, if that's the way you want to leave it, I am not
13    happy with it at a quarter to 6:00.
14              MR. SERWIN:  That is not my intent.
15              THE COURT:  It is what it is.  But in that case it
16    will be that both parties have to opt in or opt out, whichever
17    you want to do, by 5:00 for any reason, including that they
18    slept on it and decided it is a bad deal.  I think that is a
19    terrible decision for you to make.
20              MR. SERWIN:  I think I have to make that.  I don't
21    want to get in between my two principals.
22              THE COURT:  Any problem with that from the defense
23    point of view?
24              MR. KENNEDY:  Well --
25              THE COURT:  In other words, where we now are is this
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```
                                                                        8
```
      7B5NAZPN
 1    is the deal, but that if either of you for whatever reason get
 2    cold feet and send a no-thanks e-mail or fax to each other and
 3    the Court by 5:00 tomorrow, all bets are off.  I think that is
 4    a horrible waste of time, but I can't hold a gun to anyone's
 5    head if they are not prepared to settle.
 6              MR. KENNEDY:  It strikes us as inconsistent with the
 7    authority that we understood the principals had.
 8              THE COURT:  It does.
 9              Are you sure you need this, Mr. Serwin, because you
10    really are opening an entire get-out-of-jail-free card to the
11    defendants.
12              MR. KENNEDY:  We are opening, for example, the
13    opportunity for Mr. Conroy to say he doesn't like the deal.
14              THE COURT:  Yes.
15              MR. KENNEDY:  He is not here.
16              THE COURT:  All right.  If that's the decision,
17    Mr. Serwin, if you want it, I have no choice but to give it to
18    you, since there is no deal until everyone says there is a
19    deal.  But you risk, after being here for four hours -- and
20    this is your last shot -- that Mr. Conroy or someone else on
21    the defense side says, you know, Mr. Kennedy, what are you
22    crazy?  Let's get out of this mess.  Well, now they can't get
23    out of it unless they show us a clause that says an entry of
24    judgment will result in cross-defaults.
25              MR. SERWIN:  I think this is a good deal for both
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```
                                                                        9

7B5NZAPN.txt

7B5NAZPN

```
1   parties.  I like the deal.  I would like to take until 5:00
2   tomorrow.  I don't think they will change their mind.  I don't
3   think I will change my mind.
4           THE COURT:  All right.  That's where it's left.  By
5   5:00 this is binding unless either side writes a letter saying
6   that they changed their mind.
7           All right.  With that caveat now big enough to drive a
8   tanker or truck through, Mr. Serwin, do you agree to the terms
9   of agreement?
10          MR. SERWIN:  Yes.
11          THE COURT:  Mr. Kennedy, as counsel of record for the
12  defendants and subject to the assent I am going to ask
13  Mr. Breene for representing all defendants and subject to the
14  5:00 tomorrow opt-out provision, do you agree to the terms of
15  the settlement?
16          MR. KENNEDY:  I do, your Honor.
17          THE COURT:  Mr. Breene, you are one of the named
18  defendants and also a principal of the Setai Group LLC,
19  correct?
20          MR. BREENE:  Yes.
21          THE COURT:  Again, subject to the opt-out provision,
22  which I frankly hope neither side exercises, do you agree to
23  the terms of the settlement agreement as I described it.
24          MR. BREENE:  Yes.
25          THE COURT:  All right.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

10

7B5NAZPN

```
1           Both sides having now at least tentatively agreed,
2   subject to letters on my desk by 5:00 tomorrow opting out, you
3   have a quasi-binding agreement.
4           Please make your arrangements with the court reporter
5   to obtain it.  For whatever it's worth, the Court will be
6   sorely disappointed if this falls apart for something other
7   than a cross-default provision, but there's nothing I can do
8   about that.
9           All right.  Thank you all.  We are adjourned.
10          MR. KENNEDY:  Thank you, your Honor.
11          MR. LESSER:  Thank you, your Honor.
12          MR. KENNEDY:  We very much appreciate it.
13          (Adjourned)
14
15
16
17
18
19
20
21
22
23
24
25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

HON ANDREW J PECK SDNY Fax:212- -7933        Nov  7 2007 04:13pm  P001/002



# FAX  TRANSMITTAL  SHEET



## ANDREW J. PECK
## UNITED STATES MAGISTRATE JUDGE
## UNITED STATES DISTRICT COURT
### Southern District of New York
### United States Courthouse
### 500 Pearl Street, Room 1370
### New York, N.Y. 10007-1312

Fax No.:          (212) 805-7933
Telephone No.:    (212) 805-0036

**Dated:**  __November 7, 2007__                    **Total Number of Pages:** __2__

| TO | FAX NUMBER |
|---|---|
| Leonard F. Lesser, Esq. | 212-599-5459 |
| James W. Kennedy, Esq. | 212-248-0170 |
|  |  |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ZAPOLSKI/RUDD, LLC,                                :

                        Plaintiff,                 :              06 Civ. 6353 (WHP) (AJP)

        -against-                                  :              **CIVIL JUDGMENT**

THE SETAI GROUP L.L.C., JOHN P. CONROY             :
& JONATHAN J. BREENE,
                                                   :
                        Defendants.
                                                   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

        Whereas the parties have agreed to settle this action (see 11/5/07 settlement conference

transcript, 11/6/07 James Kennedy letter, and 11/7/07 Leonard Lesser letter), and have agreed that judgment

can be entered by a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

        Now, therefore, it is ORDERED, ADJUDGED AND DECREED that:

        1.      Plaintiff is awarded judgment on consent against SG 40 Broad LLC (an affiliate of

defendant Satai Group) for one million dollars ($1,000,000), and it is further ordered that

        2.      This action is dismissed without prejudice and without costs, but the Court retains

jurisdiction pursuant to the terms of the Settlement Agreement.


**Dated:**      New York, New York
                November 7, 2007

**Approved:**   November 7, 2007                          **J. Michael McMahon**
                                                          Clerk of Court


_____                     By: _____
**Hon. Andrew J. Peck**                                   Deputy Clerk
United States Magistrate Judge
Southern District of New York

This document was entered on the docket on_____


Copies **by fax & ECF** to:     Leonard F. Lesser, Esq.
                                James W. Kennedy, Esq.
                                Judge William H. Pauley III

# LETTER AGREEMENT

This Letter Agreement constitutes the binding agreement ("Agreement") between Zapolski + Rudd, LLC, a North Carolina limited liability company, or its designee ("ZR") and The Setai Group, LLC, a New York limited liability company, or its designee ("SG") regarding the disposition of One Million and NO/100 Dollars ($1,000,000.00) ("Deposit") that has been placed by ZR into escrow in connection with the planned acquisition and development by ZR and SG of the Property (defined below).

Deposit:    The parties acknowledge that ZR has placed the Deposit into escrow in order to secure SG's performance under that certain Purchase and Sale Agreement ("Purchase Agreement") dated January **19**, 2006, between SG, as purchaser, and Pop Development, LLC, 4 B's Realty Collins Avenue, LLC, and Just Around the Corner, LLC (collectively, the "Brodsky Group"), as sellers, of real property known as 237 20th Street, 2000-2038 Collins Avenue and 220 21st Street, Miami Beach, Miami-Dade County, Florida ("Property"). Under the terms of the Purchase Agreement, subject only to the conditions precedent set forth therein, upon execution of the Purchase Agreement, the Deposit will become non-refundable.

ZR's Right to Terminate:    SG and ZR wish to provide for a mechanism for ZR to obtain a return of the deposit in the event ZR elects not to proceed with the planned acquisition and development of the Property. At any time up to and including March 6, 2006, ZR shall have the right, in the exercise of ZR's sole and absolute discretion, to terminate its involvement in the acquisition and development of the Property. ZR shall exercise this right, if at all, by delivery of written notice to SG. Following receipt of written notice from ZR of ZR's election to terminate as aforesaid, SG shall continue to work in good faith to execute the documents described in the Letter of Intent (as defined in the Purchase Agreement) and failing agreement on such documents prior to the Initial Closing Date (as defined in the Purchase Agreement) (i) decide to terminate its involvement in the acquisition of the Property and instruct the Brodsky Group of same, requesting to receive a refund of the Deposit as contemplated in the Purchase Agreement (such decision referred to herein as a "Termination Decision"), or (ii) decide to proceed with its acquisition of the Property and otherwise reimburse ZR from separate funds in the amount of the Deposit (such decision referred to herein as "Go Forward Decision"). Following a Go Forward Decision, SG agrees to make reimbursement of the Deposit to ZR (said reimbursement to be personally guaranteed by John P. Conroy ("Conroy") and Jonathan J. Breene ("Breene")) within twenty one (21) business days following the Initial Closing Date (as defined in the Purchase

1

Agreement). Following a Termination Decision, SG hereby agrees to deliver to ZR the full Deposit within 2 business days following receipt of same from the Brodsky Group.

**Pursuit of Deposit:** Following (a) SG's timely receipt of written notice from ZR of ZR's election to terminate its involvement in the acquisition and development of the Property (as described hereinabove), and (b) a Termination Decision by SG, (i) SG agrees to pay over to ZR an amount equal to $500,000.00 (such payment to be personally guaranteed by Conroy and Breene) and to be made within twenty-one (21) business days after the Initial Closing Date (as defined in the Purchase Agreement), and (ii) ZR and SG covenant and agree to jointly pursue the return of the Deposit by the Brodsky Group and share the costs of such pursuit on a 50/50 basis.

**Guaranty:** Conroy agrees to execute the guaranty contemplated by this Agreement within five (5) days from the date this Agreement has been executed by all parties, and Breene agrees to execute the guaranty prior to February 1, 2006.

**Fee:** Following (a) SG's timely receipt of written notice from ZR of ZR's election to terminate its involvement in the acquisition and development of the Property (as described hereinabove), and (b) a Go Forward Decision by SG, as consideration for ZR's placement of the Deposit into escrow, SG agrees to pay to ZR a fee in the amount of Three Hundred Thousand and NO/100 Dollars ($300,000.00) ("Fee"). The Fee shall be paid by SG to ZR within twenty one (21) business days following the Initial Closing Date (as defined in the Purchase Agreement), in cash or other immediately available funds. For purposes of clarity, the Fee will not be payable to ZR in any of the following circumstances: (i) failure of ZR to timely notify SG in writing of its decision to terminate its involvement in the acquisition and development of the Property (as described hereinabove), (ii) in the event of a Termination Decision; or (iii) in the event SG elects to exercise the Buyout Option (defined below).

**SG Buyout Option:** At any time prior to the Initial Closing Date (as defined in the Purchase Agreement), SG shall have the right to purchase ZR's interest in this transaction ("Buyout Option"). SG shall exercise the Buyout Option, if at all, by delivery of written notice to ZR. The consideration for the Buyout Option shall be the reimbursement of the Deposit to ZR, together with an additional cash payment to ZR in the amount of One Million and NO/100 Dollars ($1,000,000.00) for an aggregate of Two Million and NO/100 Dollars ($2,000,000.00) ("Buyout Fee"). The Buyout Fee shall be paid to ZR in cash or other immediately available funds within three (3) business days following ZR's receipt of SG's written notice of the Buyout Option.

**Notices:** All notices, demands, consents requests or other communications provided for or permitted to be given hereunder by a party hereto must be in writing and shall be deemed to have been properly give

2

or served (i) the same day when personally delivered; or (ii) one business for delivery in the United States after deposit with a commercial courier service (e.g., Federal Express, United Parcel Service); or (iii) the same day when sent by confirmed facsimile with a copy sent by commercial courier, as follows:

If to SG:

The Setai Group LLC
405 Lexington Avenue, 54th Floor
New York, New York 10174
Attn: Mr. John P. Conroy
Telephone: (212) 947-7771
Telecopier: (212) 947-8171
Email: jconroy@setai.com

If to ZR:

Zapolski + Rudd, LLC
501 Washington Street
Durham, NC 27701
Attn: Mr. Todd Zapolski
Telephone: (919) 956-2722 x1
Telecopier: (919) 956-5063
Email: tcz@zapolskirudd.com

Confidentiality:

The parties and their respective representatives and affiliates mutually agree to maintain the confidentiality of the discussions and negotiations related to the terms set forth herein. Specifically, except as required by applicable law, no party will disclose the existence or terms hereof.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, each of the parties has duly executed and delivered this Agreement
as of the date appearing beside their respective signatures below.

ZAPOLSKI + RUDD, LLC
a North Carolina limited liability company

By: _____          Date: 1/17/06
Todd C. Zapolski,
Managing Member

THE SETAI GROUP, LLC,
a New York limited liability company

By: _____          Date: 1/17/06
John P. Conroy, Member

With respect to their agreements in the paragraphs above entitled "ZR's Right to Terminate" and
"Pursuit of Deposit":

_____               Date: 1/17/06
John P. Conroy

_____               Date: 01/17/06
Jonathan J. Breene
By: Jason S. Heithel,
his attorney in fact

4

# PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (this "Agreement") is made and entered into as of the __ day of January, 2006 (the "**Effective Date**"), by and between **THE SETAI GROUP, LLC**, a New York limited liability company ("**Purchaser**"), and **POP DEVELOPMENT, LLC** , a Florida limited liability company, **4 B's REALTY COLLINS AVENUE, LLC**, a New York limited liability company, and **JUST AROUND THE CORNER, LLC**, a Delaware limited liability company (collectively "**Seller**").

## RECITALS

A.     Seller is the owner of certain parcels of real property located in Miami Beach, Miami-Dade County, Florida (known as 237 20th Street; 2000-2038 Collins Avenue and 220 21st Street) and being more particularly described in the legal descriptions set forth in **Exhibit "A"** attached hereto and incorporated herein by this reference (the "**Land**"). The portion of the land located at 237 20th Street is herein referred to as the "**Garage Parcel**".

B.     The Land has the Entitlements (as defined below) for (i) construction of a condominium project (such improvements are herein referred to as the "**Condominium Project**"), (ii) an existing parking garage with retail space, and (iii) an expansion of the existing garage (the existing garage, as expanded, is herein referred to as the "**Garage Project**"), all as described in the Plans & Specs (as defined below).

C.     Purchaser has agreed to purchase the Property (as defined below) from Seller, and Seller has agreed to sell the Property to Purchaser, pursuant to the terms and conditions set forth in this Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the sum and receipt of Ten and No/100 Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.     RECITALS.  The foregoing recitals are incorporated herein by reference and made a part of this Agreement.

2.     PROPERTY.  Seller shall sell and convey to Purchaser, and Purchaser shall purchase and acquire from Seller, on the Closing Date (as defined below) upon the terms and conditions hereinafter set forth, all of Seller's right, title and interest in and to the following property (collectively, the "**Property**"):

a.     the Land and all improvements thereon;

b.    the easements, rights of way, and appurtenances pertaining to the Land, if any;

c.    any governmental entitlements pertaining to the Land and the construction and operation of the Condominium Project and Garage Project (the "**Entitlements**"), including, without limitation, the permits, licenses and other rights listed on <u>Exhibit "B"</u> attached hereto and incorporated herein by this reference (the "**Material Entitlements**");

d.    all plans and specifications related to the Condominium Project and Garage Project that are described on <u>Exhibit "C"</u> attached hereto and by this reference made a part hereof, as the same may be amended upon the mutual consent of Seller and Purchaser (as amended, the "**Plans & Specs**");

e.    an assignment of all agreements and warranties with third parties related to the Condominium Project and Garage Project that Purchaser elects to assume, including, without limitation, those listed on <u>Exhibit "D"</u> attached hereto and by this reference made a part hereof (the "**Third Party Agreements**");

f.    an assignment of all third party reports and studies related to the Land, Condominium Project and Garage Project, including, without limitation, those listed on <u>Exhibit "E"</u> attached hereto and by this reference made a part hereof (the "**Third Party Reports**")

g.    all condominium documents prepared by or on behalf of Seller, as hereafter amended, including, without limitation, those listed on <u>Exhibit "F"</u> attached hereto and by this reference made a part hereof (the "**Condominium Documents**"); and

h.    an assignment of all payment, performance and other bonds in place for the Condominium Project and Garage Project that are in place at the Closing Date.

3.    <u>PURCHASE PRICE</u>. The purchase price to be paid by Purchaser for the Property shall be Forty-Three Million Dollars ($43,000,000.00) plus any Approved Horizontal Work Payments (as defined in Section 5.b.(ii) below) plus any Interest Factor (as defined below) (the "**Purchase Price**"). The "**Interest Factor**" equals the product of (A) Forty-Three Million Dollars ($43,000,000.00) less the Deposit, multiplied by (B) eight percent (8%), multiplied by (C) the number of days from the Initial Closing Date (as hereinafter defined) until the Closing Date, and divided by (D) three hundred sixty-five (365). If the Closing Date is on or before the Initial Closing Date, the Interest Factor is $0. The Purchase Price shall be paid as follows:

a.    <u>Deposit</u>. Purchaser shall, within one (1) business day after execution of this Agreement, pay to Seller the sum of One Million Dollars ($1,000,000.00) ("**First Deposit**") (the First Deposit and any Extension Deposits, as defined in Section 9 below, together with any interest earned thereon, are collectively referred to as the "**Deposit**").

The Deposit is non-refundable (other than due to an event of default by Seller or failure of a condition precedent to Closing). Any interest that would have accrued on the Deposit on or before Intial Closing Date if the same had been held in escrow by the Title Company (hereinafter defined) shall be credited against the Purchase Price at Closing.

b.    Closing Payment.  In the event the Closing occurs, any portion of the Deposit delivered to Seller shall be applied against the Purchase Price.  Upon the Closing, Purchaser shall deliver the balance of the Purchase Price (subject to adjustments as set forth in this Agreement) by wire transfer of federal funds to an account designated by Seller.

4.    PURCHASER INSPECTION AND REVIEW RIGHTS.

a.    Due Diligence Materials.  To the extent not previously provided, Seller will provide to Purchaser a package of due diligence materials regarding the Property within five (5) business after the Effective Date, including, without limitation, any surveys, title policies, environmental reports, soils reports, endangered species studies, hydrology reports or other reports or studies that Seller has with respect to the Property.  Seller shall reasonably cooperate with Purchaser with respect to any and all items deemed reasonably necessary by Purchaser to further its due diligence efforts in regard to acquiring the Property and construction of the Condominium Project.  Any such assistance by Seller shall be solely at Purchaser's expense.

b.    Access to Property.  At all times prior to Closing, Purchaser and its representatives shall have the right of access to the Property during reasonable business hours and on reasonable notice to Seller to inspect the same, to perform such tests and review the construction in progress (as described below) as Purchaser determines are reasonably necessary. Purchaser shall not unreasonably interfere with the ongoing operations of the Garage Parcel or the demolition and foundation work on the balance of the Land as described below.  Purchaser shall promptly repair all damage caused to the Property by any such inspections and tests back to existing conditions, and Purchaser shall indemnify and hold Seller harmless from any and all loss, cost, liability or expense Seller may suffer (including, without limitation, attorney's fees and court costs) arising from any such inspections and tests.  Seller shall in no way be liable or responsible for any activities of Purchaser on the Property and Purchaser shall do nothing which might create any lien or encumbrance on the Property. Before entering onto the Land, Purchaser shall deliver to Seller an endorsement evidencing that Purchaser has named Seller as an additional insured on Purchaser's policy of comprehensive liability insurance, insuring Purchaser's activities on the Land in amounts reasonably acceptable to Seller.

5.    SELLER COVENANTS.

a.    Site Demolition and Grading.  Except for the garage on the Garage Parcel and the façade of the building that is required by law to be preserved as an historical feature as required by the City of Miami Beach Historical Review Board, Seller shall, at its sole and exclusive cost, prior to Closing, demolish all the improvements on the Land, clean the debris from the Land, grade the site and install a perimeter fence around the Land (except for the Garage Parcel).  This work shall be performed in accordance with all applicable codes, ordinances, regulations, statutes and laws and consistent with the Plans & Specs for the future construction of the Condominium Project and Garage Project.  Seller shall record a Notice of Termination for all work related to the site demolition and grading work and provide all items reasonably required by the Title Company (including, without limitation, and if required, an indemnity from Purchaser and any credit-worthy person or entity that may be required by the Title Company in order to issue a title policy in favor of Purchaser without exception for a notice of commencement in order for the Title Company to issue a title insurance policy in favor of Purchaser and Purchaser's lender without exception for any Notice of Commencement filed in connection with the site demolition and grading work on the Property.

b.     Horizontal Work Before Closing.

(i)   Seller has entered into that certain Standard Form of Agreement between Owner and Contractor dated June 7, 2005 between 4 B's Realty Collins Avenue, LLC and Maleta Construction Company on AIA Document A114-2001, or any replacement agreement entered into by Seller with the approval of Purchaser (not to be unreasonably withheld or delayed) to perform the horizontal work of the Condominium Project and Garage Project (e.g., pilings, wells, irrigation) pursuant to the Plans & Specs (said contract, or any replacement thereof, and the Auger Cast Pile Contract and Drainage Well Contract described below, are herein collectively referred to as the "**Horizontal Work Contract**"). In the event the work under the Horizontal Work Contract is not complete by Closing, the Horizontal Work Contract shall be assigned to Purchaser at Closing. Seller and Purchaser agree that a party selected by Purchaser and reasonably approved by Seller shall be retained, at Purchaser's cost, to oversee the work performed under the Horizontal Work Contract. Purchaser hereby approves Michael Johnson as the initial person to oversee this work. Purchaser further acknowledges that it has reviewed and approved that certain (x) Auger Cast Pile contract in the amount of $675,000 with Ebsary Foundation Company as set forth in its proposal dated November 9, 2005 and (y) Drainage Well Contract in the amount of $59,900 with Jaffer Associates Corp. as set forth in its proposal dated October 13, 2005. Purchaser agrees to reimburse Seller at Closing for any actual and reasonable out-of-pocket expenses incurred by Seller in monitoring the Horizontal Work Contract.

(ii)   Seller shall provide to Purchaser, for Purchaser's approval (not to be unreasonably withheld) copies of all invoices rendered pursuant to the Horizontal Work Contract at least two (2) business days prior to paying the same. All disbursements made by Seller pursuant to this Section 5.b(ii) that are within the bid amounts for the Horizontal Work Contract approved by Purchaser or that are not expressly rejected by Purchaser in writing within two (2) business days after receipt are herein collectively referred to as the "**Approved Horizontal Work Payments**". In no event shall Purchaser be responsible for paying any portion of the demolition and grading work described in Section 5.a. above.

(iii)   Seller acknowledges that Purchaser will not be able to close this Agreement unless the Title Company is able to deliver to Purchaser's lender a title insurance policy without exception for mechanic's or materialmen's liens arising from work performed or materials supplied prior to Closing (including, without limitation, under the Horizontal Work Contract). In the event the work under the Horizontal Work Agreement (or any other work performed by or on behalf of Seller) is not complete in sufficient time prior to Closing for the Title Company to provide such title insurance coverage for Purchaser's lender, Seller shall exercise its best efforts to obtain the appropriate lien waivers and affidavits from Seller, Maleta Construction Company and all other applicable parties that are required by the Title Company in order to issue the coverage required by Purchaser's lender (or in lieu thereof, Seller can (x) post any deposit or bond that the Title Company may accept or (y) if acceptable to the Title Company, provide an affidavit from Bert E. Brodsky averring that all work performed under the Horizontal Work Contract has been paid in full through the Closing Date). Purchaser may, at its option, postpone the Closing Date (without the payment of any extension fee) until Seller has satisfied this condition precedent.

(iv)   Seller shall not materially modify or amend the Horizontal Work Contract, waive any of its rights under the Horizontal Work Contract, nor permit as assignment

of the Horizontal Work Contract without the consent of Purchaser, which consent shall not be unreasonably withheld or delayed.

d.    Entitlements.  Seller shall, at its sole cost and expense, perform all acts as are required to keep all Entitlements for the Condominium Project in full force and effect, including, without limitation, paying all impact fees and permit fees as required by the applicable governmental authorities due and payable prior to Closing.  In the event any extra costs are incurred due to changes in the Plans & Specs as requested by Purchaser, Purchaser shall be responsible for such extra costs.

e.    Condominium Documents.    Seller shall not submit any of the Condominium Documents to the Florida Division of Business and Professional Regulations ("BPR").  Purchaser intends to amend the Condominium Documents to, among other matters, replace the identity of the "Developer" with Purchaser's entity, and thereafter submit all required Condominium Documents to the BPR for approval.  Purchaser shall send a copy of any and all amendments to the Condominium Documents and the Condominium Project to Seller for Seller's approval at least five (5) business days prior to the submitting the same to the BPR, and Seller shall have been deemed to approved such amendments to the Condominium Documents unless Seller expressly objects to the same in writing within such five (5) business day period.

f.    Garage Parcel Leases and Contract.  Except as otherwise set forth in this Agreement, prior to Closing, Seller shall cause (i) all leases of retail space within the Garage Parcel to be terminated with the premises vacated and (ii) cause any other contract related to the Garage Parcel to be terminated, provided, however, the Parking Service Management Agreement with Towne Park, Ltd. (the "Parking Agreement") shall be assumed by Purchaser at Closing. Seller shall deliver a copy of such terminations or agreements to terminate to Purchaser at or prior to Closing. Notwithstanding the foregoing, with respect to that portion of the Garage Parcel currently occupied by Josmar Corp. (the "Grocery"), at Closing, Seller shall deposit with the Title Company, in escrow, the sum of One Million ($1,000,000.00) Dollars (the "Grocery Escrow") to secure the vacature of the Garage Parcel by the Grocery on or before two (2) years from the Initial Closing Date.  Prior to the Closing, Seller shall make commercially reasonable good faith efforts to cause the Grocery to vacate the Garage Parcel. Following the Closing, Purchaser shall make commercially reasonable good faith efforts to cause the Grocery to vacate the Garage Parcel.  Purchaser shall be entitled to reimbursement from the Grocery Escrow of all sums reasonably incurred in connection with its efforts as set forth in this Section 5(f).  In the event the Grocery has not vacated the Garage Parcel on or before two (2) years from the Initial Closing Date, the Title Company shall release the Grocery Escrow, or any balance thereof as shall be remaining, to the joint venture limited liability company to be formed pursuant to that certain letter of intent of even date hereof between Seller and Purchaser (the "Letter of Intent"), a copy of which is attached hereto as Exhibit "W" and incorporated herein by this reference, and neither party shall have any further obligation to each other in connection with the matters set forth herein.  In the event the Grocery shall have vacated the Garage Parcel on or prior to two years from the Initial Closing Date, the Grocery Escrow, or any balance thereof as shall be remaining, shall be released to Seller.

g.    Maintenance of the Garage.  Seller shall, at its sole cost and expense, make any required repairs to the garage and maintain the garage in its current condition, normal wear and tear excepted, including performing any normal and scheduled maintenance and repair.

Seller shall, prior to Closing, complete the items of repair and maintenance to the garage that are listed on Exhibit "G" and by this reference made a part hereof.

h.    Marketing.    Seller agrees that it shall not, during the term of this Agreement, market the sale of condominium units in the Condominium Project. Seller acknowledges and agrees that Purchaser has the sole and exclusive right to sell and market condominium units in the Condominium Project during the term of this Agreement. In the event this Agreement is terminated for any reason other than a willful default by Seller, Purchaser agrees to assign to Seller all of Purchaser's interest in (i) any and all contracts to purchase condominium units in the Condominium Project provided that (x) Seller immediately reimburses Purchaser for any out-of-pocket sales and marketing expenses incurred to unaffiliated third parties, and (y) pays to Setai Realty, LLC a real estate commission equal to the lesser of the commission stated in the purchase contracts or 4 % of the gross sales price, payable as set forth in each such assigned contract (which does not include commissions due to outside brokers that Seller may be required to pay and which may be as high as 5% of the gross sales price), (ii) Purchaser's contract with Setai Realty, (iii) the Condominium Documents, (iv) all marketing materials, (v) any assignable licenses to use a brand name in connection with the Condominium Project, and (vi) any and all contracts relating to use of facilities by owners at the Condominium Project at Setai Resort and Residences. Purchaser has provided to Seller an estimate of the marketing expenses Seller anticipates incurring. Seller acknowledges that this is merely an estimate and Purchaser may change marketing strategy and expenditures in a manner Purchaser deems appropriate, subject to Seller's prior consent for expenditures that cumulatively exceed ten percent (10%) of Purchaser's estimates, which consent shall not be unreasonably withheld and shall be deemed granted if not expressly rejected within five (5) business days after receipt (and if rejected, shall be deemed effective as to a cumulative 10% increase) and Purchaser shall send a copy of any updated marketing budgets to Seller for Seller's information.

i.    Sales Office.    Seller hereby grants to Purchaser a license during the term of this Agreement to use and occupy Suite C in the Garage Project as a sales office and model for the Condominium Project. Purchaser shall pay all costs related to the re-modeling of Suite C and all accrued utility bills for Suite C during its occupancy. Purchaser agrees during the term of this license to carry public liability insurance covering Suite C in an amount of $1,000,000.00 for injury and/or death to one or more persons in any one accident, and property damage insurance in an amount of at least $500,000.00 naming Seller as an additional insured party and shall deliver a certificate evidencing such insurance prior to taking actual occupancy. Purchaser shall indemnify and hold Seller harmless from any loss, cost, damage or expense (including, without limitation, attorney's fees) that Seller may incur arising from Purchaser's use and occupancy of Suite C.

j.    Insurance.    Seller shall maintain its current liability insurance policies related to the Property in full force and effect throughout the term of this Agreement. Seller shall obtain, prior to the commencement of any construction work on the Property, and maintain throughout the term of this Agreement builder's risk insurance in an amount and with a company reasonably approved by Purchaser, and Seller shall provide a copy of any quote for builder's risk insurance at least two (2) business days prior to obtaining the same. Purchaser shall reimburse Seller at Closing for any actual premiums paid by Seller for builder's risk insurance that was approved by Purchaser, and less any portion that will be reimbursed to Seller by the insurance company upon the early termination of the builder's risk policy (if the amount of reimbursement is not known at the time of payment, the parties shall make a good faith estimate of this amount and adjust the payment when the actual reimbursement is known).

k.    Preconstruction Contract.   Seller agrees that Seller will cooperate in all reasonable respects with Purchaser in the deliverance to Purchaser of copies of any documents and bids received by Seller arising from Maleta Construction Company pursuant to that certain letter agreement from Maleta Construction Company to D3 Architecture, pc dated August 22, 2005, and accepted by The Elan on September 28, 2005.

l.    Pool Permit.   In the event the Department of Health permit for the construction of the swimming pool for the Condominium Project pursuant to the Plans & Specs (the "Pool Permit") is not in place by the Closing Date, (i) Seller shall bear the cost, post-Closing, of any additional expense reasonably incurred in order to obtain the Pool Permit and (ii) Seller and Purchaser shall negotiate in good faith an amount to be held back in escrow from the Purchase Price paid to Seller at Closing that may be required to obtain the Pool Permit (including, without limitation, any potential changes to the Plans & Specs that are not included in the obligations of the architect under the Third Party Agreement assigned to Purchaser at Closing).  Purchaser shall be permitted to draw upon this escrow to pay for the costs it incurs in obtaining the Pool Permit. Any portion of such escrow remaining after the Pool Permit is issued shall be paid to Seller.  If the escrow is insufficient, Seller shall pay the additional costs within ten (10) days after demand from Purchaser accompanied by duly rendered third party invoices of the costs incurred.

m.    Entitlement Fees.   Seller acknowledges that the Entitlements reflect a "Project Value" of $15,000,000, and fees were paid to the City of Miami Beach based on this valuation. In the event the City of Miami Beach or other applicable governmental authority charges additional fees (either before or after Closing) based on a higher Project Value (other than due to increases solely related to changes that Purchaser may hereafter make to the Plans & Specs), Seller shall bear the cost of such increased fees.  This covenant shall survive Closing.

6.    REPRESENTATIONS AND WARRANTIES.

I. Seller (and Bert E. Brodsky ("Brodsky") with respect to items b., h., m. (limited to ~~Bert~~ Brodsky's knowledge), p. and q below) hereby represent, warrant and covenant to Purchaser as of the date hereof and, except as otherwise provided herein, as of the Closing Date, as follows:

a.    POP Development, LLC is a limited liability company duly organized and validly existing under the laws of the State of Florida and is qualified as a limited liability company to transact business in the State of Florida.  4 B's Realty Collins Avenue, LLC is a limited liability company duly organized and validly existing under the laws of the State of New York and is qualified as a corporation to transact business in the State of Florida.  Just Around the Corner, LLC is a limited liability company duly organized and validly existing under the laws of the State of Delaware and is qualified as a limited liability company to transact business in the State of Florida.  Seller has all requisite power and authority to carry on its business as now conducted and to execute, deliver, and perform this Agreement and each of the documents executed and delivered by Seller.

b.    The execution, delivery and performance by Seller of this Agreement and the consummation by Seller of the transaction contemplated hereby have been duly authorized by all necessary action required to be taken on the part of Seller.  This Agreement has been duly and validly executed and delivered by Seller (and the person(s) executing this Agreement on behalf of Seller are authorized to do so) and constitutes the valid and binding obligation of Seller, enforceable in accordance with its terms (except as the validity, effect or enforceability may be limited or otherwise effected by bankruptcy, insolvency, reorganization, moratorium, or similar

statutes, rules, regulations or other laws).

c. At the time of Closing, the Property will be free of any liens, security interests, encumbrances or other restrictions except for the Permitted Exceptions, whether existing of record or otherwise.

d. Seller has not received a written notice of a violation of any local, state or federal laws regarding the Property that has not been cured, other than de minimis violations.

e. Seller has no knowledge of any pending or contemplated condemnation proceedings affecting the Property or any part thereof, and Seller agrees to give Purchaser prompt notice of any such contemplated condemnation or the institution of any condemnation proceeding.

f. Except as otherwise set forth in this Agreement, Seller has the exclusive right of possession of the Property, subject only to the Parking Agreement that will be assumed by Purchaser at Closing provided the same is terminable at Closing upon sixty (60) days notice from Purchaser.

g. To Seller's knowledge, no person or entity has any rights in or to acquire the Property or any part thereof. With the exception of this Agreement and the Letter of Intent, there is no contract or agreement of any kind or nature affecting the Property or the operation thereof which will survive Closing.

h. Except as set forth on <u>Exhibit "I"</u> (the "**Litigation**"), Seller is not a party to any litigation affecting the Property or any part thereof or Seller's right to sell the Property, and Seller has not received any written threat of litigation affecting the Property or any part thereof; and Seller covenants and agrees to give to Purchaser prompt notice of the institution or written threat of institution prior to Closing of any such litigation. Seller hereby indemnifies Purchaser from and against any and all loss, cost, damage, liability or expense (including, without limitation, attorney's fees, court costs and expert fees) that Purchaser may suffer or incur related to any Litigation. Seller further agrees to defend Purchaser, at Seller's cost, using counsel reasonably acceptable to Purchaser, in any matter related to any Litigation. This indemnity shall survive Closing.

i. There are no existing prior tax or governmental assessments which are unpaid, and Seller has no knowledge of any pending assessments against the Property. Any assessment which is or becomes a lien against the Property prior to Closing as a result of improvements prior to Closing shall be satisfied by Seller, regardless of when it is assessed.

j. Seller has delivered to Purchaser a true and complete copy of the environmental reports set forth in <u>Exhibit "E"</u> (the "**Environmental Reports**"). To Seller's knowledge, there are no adverse or material environmental conditions affecting the Property other than as disclosed in such reports.

<u>k.</u> <u>Exhibit "B"</u> contains a full and complete list of the existing Material Entitlements for the Condominium Project, Garage Project and for the operation of the Garage Parcel. All such Material Entitlements are valid, unconditional except as set forth on their face

and in full force and effect. All fees, costs and charges related to the Material Entitlements have been paid in full. Seller has received no material notices from any governmental authority regarding the Material Entitlements other than written notices previously provided to Purchaser. Seller will promptly send to Purchaser a copy of any future notices or communications regarding the Material Entitlements that Seller hereafter receives. Seller shall give Purchaser at least two (2) business days notice prior to any meeting with any governmental authority regarding any Entitlement or Material Entitlement, and Purchaser shall have the right to attend such meeting.

    1. Exhibit "C" contains a full and complete description of the Plans & Specs, and the Plans & Specs have not been modified or amended. Seller shall not modify or amend the Plans & Specs without the prior written consent of Purchaser, which consent shall not be unreasonably withheld or delayed.

    m. Exhibit "D" contains a full and complete list of all Third Party Agreements that Purchaser has agreed to assume. Seller will remain solely responsible for any all other agreements with third parties to which Seller (or any related or affiliated entity) is a party, whether written, verbal or implied (including, without limitation, the letter agreement between Zyscovich, Inc. and TGNC Development, LLC dated August 5, 2002) and indemnify and hold Purchaser harmless from and against any and all loss, cost, damage, liability or expense (including, without litigation, attorney's fees and court costs) arising from or related to any agreements or contracts with third parties that are not expressly assumed by Purchaser at Closing. Seller will not enter into any further agreements with any third parties regarding any portion of the Land or Condominium Project that will survive Closing and be binding upon Purchaser without Purchaser's prior written consent.

    n. To Seller's knowledge, (i) no proceedings under any federal or state bankruptcy or insolvency laws have been commenced by or against Seller which have not been terminated; (ii) no general assignment for the benefit of creditors has been made by Seller; and (iii) no trustee or receiver of Seller's property has been appointed.

    o. Seller is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code, as amended.

    p. All sales taxes related to any lease and the operation of the Garage Parcel have been paid in full on a timely basis, and such taxes shall be paid as and when due through the Closing Date.

    q. Seller has delivered to Purchaser its most recent financial statement regarding the operation of the Garage Parcel. To Seller's knowledge, this financial statement is a true and accurate as of the date thereof. Seller shall provide copies of updates of this financial statement promptly after issuance.

    r. As of the date hereof, and through and including Initial Closing Date, there is no moratorium in effect that will affect the ability of Purchaser to construct the Condominium Project and Garage Project pursuant to the Entitlements and Plans & Specs.

    "Seller's knowledge", for purposes of the foregoing warranties, shall mean the actual knowledge of either Brodsky or Kenneth Faltischek. Seller will notify Purchaser in

writing if it receives knowledge or information prior to Closing that any of the above warranties are not substantially true. The truth of the foregoing warranties is a condition to Purchaser's obligation to purchase, and if the warranties are not true at Closing in any material respect, then Purchaser may rescind this Agreement and receive a return of the Deposit. Except as otherwise set forth in this Agreement, the warranties shall be deemed repeated as of the date of Closing and the representations and warranties in Subsections b., h., m., p. and q. above shall survive Closing, provided that Purchaser shall be deemed to have waived its right to make any claims on any of the foregoing warranties except for those warranties that Purchaser notifies Seller, within six (6) months after Closing, are not materially true and correct.

II. Purchaser hereby represents, warrants and covenants to Seller as of the date hereof and as of the Closing Date, as follows:

a. The Setai Group, LLC is a limited liability company duly organized and validly existing under the laws of the State of New York and is qualified as a limited liability company to transact business in the State of Florida. Purchaser has all requisite power and authority to carry on its business as now conducted and to execute, deliver, and perform this Agreement and each of the documents executed and delivered by Purchaser.

b. The execution, delivery and performance by Purchaser of this Agreement and the consummation by Purchaser of the transaction contemplated hereby have been duly authorized by all necessary action required to be taken on the part of Purchaser. This Agreement has been duly and validly executed and delivered by Purchaser (and the person(s) executing this Agreement on behalf of Purchaser are authorized to do so) and constitutes the valid and binding obligation of Purchaser, enforceable in accordance with its terms (except as the validity, effect or enforceability may be limited or otherwise effected by bankruptcy, insolvency, reorganization, moratorium, or similar statutes, rules, regulations or other laws).

7. **TITLE, SURVEY, ENVIRONMENTAL REPORTS, COMMITMENT LETTER.**

a. <u>Title Commitment</u>. Seller will deliver to Purchaser a copy of its owner title insurance policy(ies) within five (5) days from the Effective Date, and Purchaser, at its cost, shall cause a title company selected by Purchaser (the "**Title Company**") to issue a title insurance commitment in the amount of the Purchase Price. Purchaser shall give Seller written notice (the "**Title Notice**") on or before thirty (30) days from the Effective Date if Purchaser objects to any of the title exceptions. In the event that Purchaser objects to any title exceptions, Purchaser shall state in the Title Notice which exceptions to the Title Commitment are unacceptable, it being understood that at the Closing all mortgages and other liens specified in the Title Commitment that are satisfied by the payment of money shall be satisfied of record from the proceeds of the Purchase Price. All title exceptions appearing in the Title Commitment that are not timely objected to by Purchaser shall be deemed "**Permitted Exceptions.**" Seller shall have twenty (20) days after receipt of the Title Notice to commit to cure said objections prior to closing or, notify Purchaser that Seller is unable or determines not to remove the title objections. If Seller notifies Purchaser that Seller will not cure any title exception set forth in the Title Notice, Purchaser may, at Purchaser's option (i) accept title subject to such objection(s), in which event said objection(s) shall be deemed Permitted Exceptions, (ii) defer Closing (without paying any additional Deposit) to provide additional time for Seller to cure the title exception(s), or (iii) rescind this Agreement, whereupon this Agreement shall terminate and the Deposit shall be refunded to Purchaser. The title policy in favor of Purchaser shall be issued at

Closing in the amount of the Purchase Price by an agent for the Title Company selected by Purchaser. Notwithstanding the above, Purchaser hereby agrees that the exceptions to title listed on Exhibit "J" attached hereto and by this reference made a part hereof shall be deemed Permitted Exceptions.

        b.    Survey. Purchaser may, at its option and expense, cause a survey of the Property to be prepared prior to the Closing. In the event such survey depicts any exceptions to title not included in the Title Commitment, Purchaser may include the same in a supplemental Title Notice and the provisions of Section 7.a. (other than the timing of the Title Notice) shall apply to any such exception.

        8.    CONDITIONS PRECEDENT. Purchaser shall have no obligation to proceed to Closing if any of the following conditions precedent have not occurred or are not true as of the Closing Date:

        a.    All representations and warranties of Seller are true and correct as of the Closing Date in all material respects, and Seller has performed all of its covenants under this Agreement in all material respects, including, without limitation, delivery of all of the documents required in Section 11 of this Agreement.

        b.    All the Entitlements are valid and in full force and effect and there is no moratorium in effect on or before the Initial Closing Date by any applicable governmental authority.

        c.    The Title Company is prepared at Closing to issue a title insurance policy to Purchaser at normal promulgated rates subject only to the Permitted Exceptions.

        d.    If the Closing Date occurs on or before the Initial Closing Date, Seller has applied (in sufficient time to be on the agenda of the March 2006 meeting for the City of Miami Beach the Board of Adjustment) for, at its cost, a minimum of a twelve (12) month extension of the obligation to complete the Garage Project and Condominium Project as set forth in the Board of Adjustment Modification Order signed June 15, 2004 and recorded in O.R. Book 22515, page 2370, Public Records of Miami-Dade County, Florida.

        e.    If the Closing Date occurs after the March 2006 meeting of the City of Miami Beach the Board of Adjustment, Seller has obtained, at its cost, a minimum of a twelve (12) month extension of the obligation to complete the Garage Project and Condominium Project as set forth in the Board of Adjustment Modification Order signed June 15, 2004 and recorded in O.R. Book 22515, page 2370, Public Records of Miami-Dade County, Florida.

        f.    Except as otherwise provided in this Agreement, all tenant leases have been terminated and all tenants have vacated the Property.

        g.    Purchaser has not discovered on or before thirty (30) days from the date hereof (i) the existence of any hazardous materials other than as disclosed in the Environmental Reports that may have a material adverse effect on the Property or (ii) that there has been any violation of any environmental laws other than as disclosed in the Environmental Reports.

        h.    The failure, for any reason whatsoever, of the applicable parties to execute

and deliver on or before the Initial Closing Date, each and every document as described in the Letter of Intent.

Upon the failure of any condition precedent, Purchaser may, at its option, terminate this Agreement whereupon the Deposit shall be returned to Purchaser.

9.    CLOSING.  Subject to the extensions referenced below, the closing of the sale of the Property ("Closing") shall occur on or before March __, 2006 ("Initial Closing Date") through an escrow with the Title Company.  Purchaser may extend the Initial Closing Date until ninety (90) days after the Initial Closing Date by paying an additional deposit (herein called the "Extension Deposit") of Three Million Dollars ($3,000,000.00) to Seller in the manner described in Section 3 above on or before the Initial Closing Date (the actual date of Closing is herein referred to as the "Closing Date").  Absent agreement to the contrary, the Closing shall take place at 11:00 a.m. local time on the last permissible Closing Date at the office of the Title Company.  If the last permissible Closing Date falls on a date when federal or state banks are closed, the last permissible Closing Date shall be extended to the next date when federal and state banks are open for business.  In the event that the First Deposit or either of the Extension Deposits are returnable to Purchaser under the terms of this Agreement, Brodsky personally guarantees the timely return of these funds.

10.    CLOSING COSTS AND ADJUSTMENTS.  At Closing, the following items shall be borne, adjusted, prorated or assumed by or between Seller and Purchaser, as follows:

a.    Adjustments and Prorations.

(i)    Real Estate Taxes.  Real estate taxes shall be prorated as of 11:59 P.M. of the earlier of Initial Closing Date, or the day prior to the Closing Date (the "Proration Date") on the basis of the taxes paid for the most recent tax year that has been assessed and with maximum discount allowed (i.e., as if taxes were paid in November of the year for which the tax is assessed).  If the Proration Date shall occur before the tax rate for the then current year is established, the proration shall be based upon the tax rate for the preceding year applied to the latest assessed valuation of the Property.  Subsequent to the Closing, when the tax is fixed for the year in which the Closing occurs, Seller and Purchaser agree to re-prorate and adjust the proration of taxes for the Property and, if the re-proration results in an adjustment of more than Five Hundred and No/100 Dollars ($500.00), to refund or pay (as the case may be) such sums as shall be necessary to effect such adjustment within thirty (30) days of written demand therefor. This Section shall survive the Closing.

(ii)    Certified/Pending Liens.  Any governmental liens that are paid on an annual basis shall, as of the Proration Date, be prorated for the year of Closing between Seller and Purchaser.

(iii)    Utilities.  Seller shall be responsible for all utility bills through the Proration Date, and Purchaser shall be responsible for such bills thereafter.  Purchaser shall have the utility companies put the billings for utilities to the Property in the name of Purchaser as of the Closing Date.  In the event that the utility companies do not prepare new bills for the Property as of the Closing Date, Seller and Purchaser shall prorate the utility costs for the Property based at Closing on the most recent bills, and they shall make any further adjustment within sixty (60) days after Closing as may be appropriate.

b.    Income.  All income generated or derived from the Property (including, without limitation, under the Parking Agreement and Josmar Lease, shall be prorated as of the Proration Date.

c.    Closing Costs.

(1)    Each party shall bear the fees and charges of its respective attorneys, consultants, engineers, accountants, architects and other professionals and/or representatives.

(2)    Purchaser shall pay the cost of preparing the title commitment, and any corrective instruments, if any, and the title premium for the owner's title policy.

(3)    Seller shall pay the cost of state documentary stamps and Miami-Date County surplus which are required to be affixed to the Deed, as defined below.

(4)    Purchaser shall pay all costs related to any purchase money financing.

11.    CLOSING DOCUMENTS.

a.    Seller's Documents At Closing.  At the Closing, Seller shall execute and deliver to Purchaser the following:

(i)    Counterparts of the Closing Statement;

(ii)    General Warranty Deed, duly executed and acknowledged by Seller, so as to convey to Purchaser fee simple title to the Land, subject to and in accordance with the provisions of this Agreement in the form attached hereto as Exhibit "K" and by this reference made a part hereof (the "Deed");

(iii)    A Seller's Affidavit in form and content as may be reasonably required by the title insurance company to provide the "gap" coverage necessary to issue at Closing, an endorsement to the Title Commitment, deleting the standard "gap" exception, the standard mechanic's lien exception and the standard parties in possession exception in the form attached hereto as Exhibit "L" and by this reference made a part hereof.

(iv)    Non-foreign Affidavit evidencing that Purchaser shall not be liable for transfer liability under Section 1445 of the Internal Revenue Code, as amended, in the form attached hereto as Exhibit "M" and by this reference made a part hereof.

(v)    An assignment of all the Entitlements in the form attached hereto as Exhibit "N" and by this reference made a part hereof, together with all appropriate consents from the applicable governmental authorities, if required to make such assignment valid and effective.

(vi)    An assignment of all Third Party Agreements, together with a consent from the other parties thereto consenting to the assignment, and acknowledging that

there are no defaults thereunder and that such third party has been paid in full for work performed through the Closing Date, in the form attached hereto as <u>Exhibit "O"</u> and by this reference made a part hereof.  To the extent a Third Party Agreement has been fully performed by the third party on behalf of Seller, (e.g., a soil report or environmental report), such third party shall deliver a written document authorizing Purchaser to rely on the Third Party Agreement (or report or findings issued as a result thereof) as if Purchaser were the original contracting party substantially in the form attached hereto as <u>Exhibit "P"</u> and by this reference made a part hereof.

(vii)    An assignment of the Plans & Specs, together with written consent of the architect or engineer to such assignment in the form attached hereto as <u>Exhibit "Q"</u> and by this reference made a part hereof.

(viii)    An electronic Word version of the Condominium Documents, and an assignment of the right to use the Condominium Documents.  Seller shall use reasonable efforts to obtain the written consent to the assignment from the attorney who drafted the Condominium Documents, which consent shall include the right to revise the Condominium Documents, and either retain such attorney's name thereon (assuming the original drafting attorney approves the revisions) or remove such attorney's name from the Condominium Documents and replace it with the name of the attorney who makes the revisions, all in the form attached hereto as <u>Exhibit "R"</u> and by this reference made a part hereof (provided, however, Item 3 of the Consent and Joinder which forms a part of <u>Exhibit "R"</u> may be deleted from the final document).

(ix)    A certification that the representations and warranties of Seller set forth in this Agreement remain true and correct in all material respects as of the Closing Date in the form attached hereto as <u>Exhibit "S"</u> and by this reference made a part hereof.

(x)    An indemnification regarding the Litigation in the form attached hereto as <u>Exhibit "T"</u> and by this reference made a part hereof.

(xi)    An indemnification regarding the operation of the Garage Parcel in the form attached hereto as <u>Exhibit "U"</u> and by this reference made a part hereof.

(xii)    An indemnification regarding the construction performed on the Property prior to Closing in the form attached hereto as <u>Exhibit "V"</u> and by this reference made a part hereof.

(xiii)    To the extent in Seller's possession or easily accessible to Seller, an original of: all the Entitlements; all the Plans & Specs; all warranties that pertain to the Property; all Third Party Agreements that survive Closing; all Third Party Reports and letters from the issuers of the Third Party Reports authorizing Purchaser to rely on the same as if an initial beneficiary of such report; and any payment, performance or other bond related to the Property.  In the event an original of the foregoing is not delivered, a copy of the same.

(xiv)    An updated financial statement certified by Seller as true and correct regarding the operations of the Garage Parcel.

(xv)    Any documents reasonably necessary or advisable to consummate the transaction contemplated hereby.

b. <u>Purchaser's Documents At Closing</u>. At Closing, Purchaser shall execute or cause to be executed by the appropriate persons and/or deliver to Seller the following:

(i)    Counterparts of the Closing Statement.

(ii)    Any documents reasonably necessary to consummate the transaction contemplated hereby.

(iii)    To the extent applicable, counterparts of documents listed in Section 11.a. above.

(iii)    The balance of the Purchase Price due at Closing.

c. <u>Assumption of Existing Mortgages</u>. Seller shall use its good faith efforts to cause HSBC Bank ("<u>HSBC</u>"), the holder of existing mortgages encumbering the Property (the "<u>Existing Mortgages</u>"), to assign the lien of the Existing Mortgages to Purchaser's lender at the Closing; provided that at least twenty (20) days prior to the Closing Date, Purchaser shall provide Seller with the name of Purchaser's lender and the name and contact information of Purchaser's lender's attorneys. As used herein, "<u>good faith efforts</u>" shall be deemed to mean one (1) written request by Seller to HSBC regarding the assignment of the Existing Mortgages, and if HSBC does not respond to such written request, one (1) person to person (<u>i.e.</u>, not voice-mail) telephonic request by Seller to HSBC, together with reasonable cooperation if HSBC is willing to comply with such request. Notwithstanding anything to the contrary contained in this Agreement, the assignment by HSBC of the Existing Mortgages to Purchaser's lender shall not be a condition precedent to the obligation of Purchaser to close hereunder, nor shall the refusal or inability of HSBC to assign the Existing Mortgages give Purchaser a reason or right not to close hereunder. At the Closing, Purchaser shall reimburse Seller for all costs and expenses incurred by Seller in connection with the assignment of mortgage, including, without limitation, the legal fees and expenses of Seller's attorneys. At the Closing, Purchaser also agrees to pay all fees charged by HSBC for such assignment, including, without limitation, the legal fees and expenses of HSBC's attorneys and all recording and filing costs in connection with such assignment, that are in excess of the charges Seller would have incurred for merely satisfying and terminating the Existing Mortgages. The obligations of Purchaser pursuant to this Section 11.c. shall survive the Closing or the earlier termination of this Agreement.

12.    <u>DEFAULT</u>.

a.    If any of Seller's representations and warranties contained herein shall not be true and correct in any material respect, or if Seller shall have failed to deliver the closing documents described in Section 11.a. within the time for performance as specified herein (including Seller's obligation to consummate the transactions contemplated hereby) or otherwise defaults on any of Seller's obligations under this Agreement, Purchaser shall be entitled to either (i) terminate this Agreement and receive the return of the Deposit (whether disbursed or not), provided, however, if Seller has willfully breached this Agreement, in addition to the return of the Deposit, Seller shall pay liquidated damages in the amount of Two Million and no/100 Dollars ($2,000,000.00) and not as a penalty or forfeiture, actual damages being difficult or impossible to measure (Seller shall be deemed to have "willfully breached" this Agreement if, among other matters, Seller willfully refuses to convey the Property to Purchaser after a valid

15

tender of the balance of the Purchase Price, Seller has conveyed the Property to a third party, Seller does not hold fee simple title to the Property as of the Closing Date, or Seller has willfully and knowingly made a material false representation to Purchaser in this Agreement), or (ii) sue for specific performance of this Agreement. In the event (x) Seller fails to convey the Property to Purchaser after a valid tender of the balance of the Purchase Price for reasons other than Seller's willful refusal, or (y) Purchaser has incurred more than Two Million and no/100 Dollars ($2,000,000.00) in actual out-of-pocket costs and specific performance is not available to Purchaser due to the actions of Seller (e.g., Seller conveys the Property for value to a bona fide purchaser without notice of this Agreement), and (z) Purchaser terminates this Agreement as a result of this failure, in addition to a return of the Deposit to Purchaser, Seller shall reimburse Purchaser for all unaffiliated third party out-of-pocket expenses actually incurred by Purchaser in connection with this Agreement (including, without limitation, negotiations, due diligence, sales and marketing to the extent not paid under Section 5.h. above, fees and costs paid to prospective lenders, and attorney's fees related to the foregoing). In the event any portion of the Deposit has been disbursed to Seller and Seller subsequently defaults under this Agreement, Purchaser shall have, and Seller hereby grants to Purchaser, a lien against the Land to secure the repayment of such portion of the Deposit.

b. If Purchaser shall have failed to perform in any material respect, any of the covenants and agreements contained herein to be performed by Purchaser prior to the Closing Date, within the time for performance as specified herein (including Purchaser's obligation to consummate the transaction contemplated hereby), Escrow Agent shall (subject to Section 19 below) deliver the Deposit to Seller (together with accrued interest thereon), as full liquidated damages and not as a penalty or forfeiture, actual damages being difficult or impossible to measure.

13.    BROKERAGE. Purchaser and Seller each represent and warrant to the other that neither has had any dealings with any person, firm, broker or finder in connection with the negotiations of this Agreement and/or the consummation of the purchase and sale contemplated hereby other than Peter Amaruso ("Broker"). At Closing, but only in the event of Closing, Seller shall pay a real estate commission to Broker pursuant to a separate agreement between Seller and Broker. Seller and Purchaser do each hereby indemnify, defend, protect and hold the other harmless from and against any liabilities, costs, obligations, claims and expenses (including, without, limitation, attorney's fees and court costs) arising from or related to any claim for compensation, commission or charges which may be asserted by any other broker, finder or other similar party by reason of any actions of the indemnifying party.

14.    ASSIGNMENT. Purchaser may assign or transfer any or all of its rights or obligations under this Agreement to any party owned or controlled by, or under common control with, Purchaser, provided that such assignment shall not release Purchaser from any obligation hereunder. Purchaser shall be deemed in control of an assignee if Purchaser is a manager (if a limited liability company) or general partner (if a partnership) of such entity, or if Purchaser owns or controls fifty percent (50%) or more of the voting interest of such entity. Seller hereby consents to any assignment to any entity that has both The Setai Group, LLC and Zapolski + Rudd, LLC (or their respective affiliates) as members or partners. Notwithstanding the foregoing, Seller shall have the right to approve any assignment of this Agreement that is effective more than one (1) hour prior to Closing, which consent shall not be unreasonably withheld or delayed. In the event any such assignment is to a party wholly unrelated to or unaffiliated with Purchaser, Seller may require, as a condition to such consent, that Purchaser

16

pay to Seller one-half (1/2) of any consideration Purchaser receives for such assignment.

15.  RISK OF LOSS.  Seller shall retain all risk and liability for damage to or injury occurring to the Property by fire, storm, accident, or any other casualty or cause until the Closing has been consummated.  If, between the date hereof and the Closing, the improvements on the Garage Parcel or Condominium Project are "materially damaged" (as defined below), Seller shall promptly, and in any event prior to the Closing, notify Purchaser of same.  Purchaser may elect, by written notice delivered to Seller within fifteen (15) days after receipt of such notice to terminate this Agreement without further liability to Purchaser, and neither party shall have any further obligation to the other hereunder except as may be expressly provided herein.  The Closing Date shall be extended as necessary to permit Purchaser the full fifteen (15) days. "Materially damaged" means damage costing in Purchaser's reasonable judgment $750,000 or more to repair.  If Purchaser does not so terminate, in the case of Material Damage, Seller shall assign to Purchaser at the Closing its right to recover under any insurance policies covering such damage and shall pay Purchaser at the Closing the amount of the insurance proceeds previously collected plus any deductible or other self-insured retention.  If between the date hereof and the Closing Date, the improvements suffer damage which is not material, Seller shall repair such damage at its expense prior to the Closing.

16.  CONDEMNATION.  If, prior to Closing, any governmental authority or other entity having condemnation authority shall institute an eminent domain proceeding or take any steps preliminary thereto (including the giving of any direct or indirect notice of intent to institute such proceedings) with regard to a any material portion of the Land, and the same is not dismissed prior to Closing, Purchaser shall be entitled, as its sole and exclusive remedy, to terminate this Agreement upon written notice to Seller prior to Closing and receive a refund of the Deposit; Seller agrees to give prompt notice to Purchaser of its knowledge of any actual or threatened condemnation proceedings.  In the event Purchaser does not terminate this Agreement pursuant to the preceding sentence, Purchaser shall be conclusively deemed to have elected to accept such condemnation and waive any right to terminate this Agreement as a result thereof.  If Purchaser waives (or is deemed to have waived) the right to terminate this Agreement as a result of such a condemnation, despite such condemnation, Seller and Purchaser shall close this Agreement in accordance with the terms hereof with no reduction in the Purchase Price, and Seller shall credit any condemnation proceeds received by Seller prior to closing, less any amounts paid by Seller toward the repair or restoration of the Property, and assign to Purchaser at Closing all of Seller's right, title and interest in and to all proceeds resulting or to result from said condemnation.

17.  NOTICES.  All notices, demands, consents, requests or other communications provided for or permitted to be given hereunder by a party hereto must be in writing and shall be deemed to have been properly given or served (i) the same day when personally delivered; or (ii) one business day for delivery in the United States and three (3) business days for international delivery after deposit with a commercial courier service (e.g., Federal Express, United Parcel Service), or (iii) the same day when sent by confirmed facsimile with a copy sent by commercial courier, as follows:

If to Purchaser:       The Setai Group LLC
                       405 Lexington Avenue, 54th Floor
                       New York, New York 10174
                       Attn: Mr. John P. Conroy

17

Telephone: (212) 947-7771
Telecopier: (212) 947-8171
Email: jconroy@setai.com

With a copy to:       The Setai Group LLC
100 21st Street
Miami Beach, Florida 33139
Attn: Mr. Jason S. Herthel
Telephone: (305) 606-9811
Telecopier: (305) 672-9922
Email: jherthel@setai.com

With a copy to:       Zapolski + Rudd, LLC
501 Washington Street
Durham, NC 27701
Attn: Mr. Todd Zapolski
Telephone: 919 956 2722 x2
Telecopier: 919 956 5063
Email: tcz@zapolskirudd.com

With a copy to:       Leo Rose III, Esq.
Schreeder, Wheeler & Flint, LLP
127 Peachtree Street, N.E.
1600 Candler Building
Atlanta, Georgia 30303-1845
Telephone: (404) 954-9823
Telecopier: (404) 681-1046
Email: lrose@swfllp.com

If to Seller:       POP Development, LLC
4 B's Realty Collins Avenue, LLC
Just Around The Corner, , LLC
c/o 4 B's Realty
26 Harbor Park Drive
Port Washington, NY 11050
Attn: Bert E. Brodsky and Kenneth Faltischek, Esq.
Telephone: 516/484-4400
Telecopier: 516/484-3290
Email: bbrodsky@sandata.com; kfaltischek@sandata.com

With a copy to:       Herrick Feinstein LLP
2 Park Avenue
New York, NY 10016
Attn: Jordan J. Metzger, Esq.
Telephone: 212/592-5904
Telecopier: 212/545-3396
Email: jmetzger@herrick.com

18

Any of the aforementioned parties may change its address for the receipt of notices, demands, consents, requests and other communications by giving written notice to the other in the manner provided for above.  The provisions of this Section 17 shall survive the Closing or any termination of this Agreement.

18.  EXCLUSIVE AGREEMENT.  Seller acknowledges that upon the payment of the first Extension Deposit, this Agreement will be an exclusive agreement and Seller shall not thereafter have the right, throughout the entire term of this Agreement, to market the Property to third parties or to enter into back-up contracts for the purchase, sale, lease, conveyance or other disposition of the Property.

19.  CAPTIONS AND HEADINGS.  Captions and Article headings contained in this Agreement are for convenience and reference only and in no way define, describe, extend or limit the scope or intent of this Agreement nor the intent of any provision hereof.

20.  NO WAIVER.  No waiver of any provision of this Agreement shall be effective unless it is in writing, signed by the party against whom it is asserted and any such written waiver shall only be applicable to the specific instance to which it related and shall not be deemed to be a continuing or future waiver.

21.  COUNTERPARTS AND FACSIMILE SIGNATURES.  This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original but all of which shall constitute one and the same agreement.  Facsimile of signed copies of this Agreement shall be valid for all purposes.

22.  BINDING EFFECT.  This Agreement shall inure to the benefit of and shall be binding upon the parties hereto and their respective successors and assigns.

23.  GOVERNING LAW.  This Agreement shall be construed and interpreted according to the laws of the State of Florida.  Seller and Purchaser hereby irrevocably and unconditionally (a) submit to personal jurisdiction in the State of Florida over any suit, action or proceeding arising out of or relating to this Agreement, and (b) waive any and all personal rights under the laws of any state to object to jurisdiction within Miami-Dade County, Florida or venue in any particular forum within Miami-Dade County, Florida.

24.  GENDER.  All terms and words used in this Agreement, regardless of the number and gender in which used, shall be deemed to include any other gender or number as the context or the use thereof may require.

25.  INTERPRETATION.  This Agreement shall not be construed more strictly against one party than against the other merely by virtue of the fact that it may have been prepared by counsel for one of the parties, it being recognized that Seller and Purchaser have contributed substantially and materially to the preparation of this Agreement.  Wherever used in this Agreement, "any" means "any and all"; and "including" means "without limitation"; "indemnify" means that the indemnitor will defend, indemnify and hold the indemnitee harmless against any claims, demands, losses or liabilities asserted against or incurred by the indemnitee to any third party because of the subject matter of the indemnity; "may not" and other negative forms of the verb "may" each are prohibitory; and "will", "must" and "should" each are mandatory; and, except as set forth in Section 15 of this Agreement, "material" shall mean any

matter that has an effect of $150,000 or more on the value of the Property or that could reasonably be expected to increase the cost of the constructing the Condominium Project or Garage Project by $150,000 or more, or that could reasonably be expected to delay by sixty (60) days or more the commencement or completion of the Condominium Project or Garage Project pursuant to the Plans & Specs; and "survive termination of this Agreement" means that such covenants, representations or warranties shall extend beyond the Closing Date and the recording of the Deed, and, if applicable, for the period of time, specified in this Agreement. Unless this Agreement expressly or necessarily requires otherwise (i) any time period measured in "days" means consecutive calendar days, except that the expiration of any time period measured in days that expires on a Saturday, Sunday or legal holiday automatically will be extended to the next day so that it is not a Saturday, Sunday or legal holiday; (ii) any action is at the sole expense of the party required to take it; (iii) the scope of any indemnity includes any costs and expenses, including reasonable attorneys' fees through all levels of proceedings incurred in defending any indemnified claim, or in enforcing the indemnity, or both.

26.    ENTIRE AGREEMENT.    This Agreement and the Exhibits attached hereto contain the entire agreement between the parties.    There are no promises, agreements, conditions, undertaking, warranties, or representations, oral or written, express or implied between the parties other than as herein set forth.    No amendment or modification of this Agreement shall be valid unless the same is in writing and signed by the parties hereto.    No waiver of any of the provisions of this Agreement or any other agreement referred to herein shall be valid unless in writing and signed by the party against whom enforcement is sought.

27.    RADON DISCLOSURE: "RADON GAS".    Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed Federal and State guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit. Seller does not make any representation, express or implied, as to the presence or absence of Radon Gas at the Land.

28.    TIME IS OF THE ESSENCE.    Time is of the essence in respect to this Agreement.

29.    ATTORNEYS' FEES.    In the event of any controversy, claim or dispute between the parties affecting or relating to the purposes or subject matter of this Agreement, including, but not limited to, any bankruptcy or appellate proceeding, the prevailing party shall be entitled to recover from the non-prevailing party all of its reasonable expenses, including reasonable attorneys' fees.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, Seller and Purchaser do hereby execute this Agreement as of the date first written above.

**PURCHASER:**
**THE SETAI GROUP, LLC,**
a New York limited liability company

By: _____
Name: _____
Title: _____

| **SELLER:**<br>**POP DEVELOPMENT, LLC,**<br>a Florida limited liability company<br><br><br>By: _____<br>Name: _____<br>Title: _____ | **4 B's REALTY COLLINS AVENUE, LLC**<br>a New York limited liability company<br><br><br>By: _____<br>Name: _____<br>Title: _____ |
| **JUST AROUND THE CORNER, LLC,**<br>a Delaware limited liability company<br><br><br>By: _____<br>Name: _____<br>Title: _____ | |

By the execution hereof in his individual capacity, Bert E. Brodsky hereby joins in this Agreement for the purpose of (i) making the representations and warranties set forth in items b., h. (limited to his knowledge), m., p. and q. of Section 6 of this Agreement, which representations and warranties shall survive Closing to the extent set forth in Section 6 of this Agreement, and (ii) personally guaranteeing the return of the First Deposit and the Extension Deposit, if any, pursuant to Section 9 of this Agreement.

_____
Bert E. Brodsky

IN WITNESS WHEREOF, Seller and Purchaser do hereby execute this Agreement as of the date first written above.

PURCHASER:
THE SETAI GROUP, LLC,
a New York limited liability company

By:
Name: _John P Codrey_
Title: _Member_

SELLER:

| POP DEVELOPMENT, LLC,<br>a Florida limited liability company<br><br>By:<br>Name: _Bert E. Brodsky_<br>Title: _Managing Member_ | 4 B's REALTY COLLINS AVENUE, LLC<br>a New York limited liability company<br><br>By:<br>Name: _Bert E. Brodsky_<br>Title: _Sole Member_ |
| JUST AROUND THE CORNER, LLC,<br>a Delaware limited liability company<br><br>By:<br>Name: _Bert E. Brodsky_<br>Title: _Manager_ | |

By the execution hereof in his individual capacity, Bert E. Brodsky hereby joins in this Agreement for the purpose of (i) making the representations and warranties set forth in items b., h. (limited to his knowledge), m., p. and q. of Section 6 of this Agreement, which representations and warranties shall survive Closing to the extent set forth in Section 6 of this Agreement, and (ii) personally guaranteeing the return of the First Deposit and the Extension Deposit, if any, pursuant to Section 9 of this Agreement.

Bert E. Brodsky

IN WITNESS WHEREOF, Seller and Purchaser do hereby execute this Agreement as of the date first written above.

PURCHASER:
THE SETAI GROUP, LLC,
a New York limited liability company

By: _____
Name: _____
Title: _____

SELLER:

| POP DEVELOPMENT, LLC, <br> a Florida limited liability company <br><br> By: _____ <br> Name: Bert E. Brodsky <br> Title: Managing Member | 4 B's REALTY COLLINS AVENUE, LLC <br> a New York limited liability company <br><br> By: _____ <br> Name: Bert E. Brodsky <br> Title: Sole Member |
| JUST AROUND THE CORNER, LLC, <br> a Delaware limited liability company <br><br> By: _____ <br> Name: Bert E. Brodsky <br> Title: Manager | |

By the execution hereof in his individual capacity, Bert E. Brodsky hereby joins in this Agreement for the purpose of (i) making the representations and warranties set forth in items b., h. (limited to his knowledge), m., p. and q. of Section 6 of this Agreement, which representations and warranties shall survive Closing to the extent set forth in Section 6 of this Agreement, and (ii) personally guaranteeing the return of the First Deposit and the Extension Deposit, if any, pursuant to Section 9 of this Agreement.

_____
Bert E. Brodsky

# GUARANTY

THIS GUARANTY AGREEMENT is given this 13th day of January, 2006 by the undersigned (collectively whether one or more "**Guarantor**") to Zapolski + Rudd, LLC, a North Carolina limited liability company ("**ZR**").

WITNESSETH THAT:

As an inducement for ZR to enter into that certain Letter Agreement on January 11, 2006 between ZR and The Setai Group, LLC ("**SG**") (the "Letter Agreement"); and

As a further inducement for ZR's performance under the Letter Agreement;

Guarantor agrees as follows:

1.    <u>Guaranty</u>.  Guarantor unconditionally and irrevocably guarantees to ZR, and the successors and assigns of ZR, the full and punctual payment of all amounts due and owing to ZR by SG pursuant to the terms, covenants and conditions of the paragraphs of the Letter Agreement entitled "ZR's Right to Terminate" and "Pursuit of Deposit."  Guarantor waives notice of any breach or default by SG. This Guaranty constitutes the primary obligation of the Guarantor, and ZR's ability to proceed against Guarantor hereunder is not conditioned upon ZR pursuing any remedy against SG or any other guarantor that may now or hereafter guaranty SG's obligations under the Letter Agreement.

2.    <u>No Waiver by ZR</u>.  Any act of ZR, or the successors or assigns of ZR, consisting of a waiver of any of the terms or conditions of the Letter Agreement, or the giving of any consent to any manner or thing relating to the Letter Agreement, or the granting of any indulgences or extensions of time to SG, may be done without notices to Guarantor and without releasing the obligations of Guarantor hereunder.

3.    <u>Effect of Security; Modification</u>.  The obligations of Guarantor hereunder shall not be released by ZR's receipt or release of security given for the performance and observance of covenants and conditions in the Letter Agreement contained on SG's part to be performed or observed, nor by any modification of such Letter Agreement; but in case of any such modification, the liability of Guarantor shall be deemed modified in accordance with the terms of any such modification of the Letter Agreement.

4.    <u>Guarantor's Liability Unaffected</u>.  The liability of Guarantor shall in no way be affected by (a) the release or discharge of SG in any proceedings of creditors, receivership, bankruptcy or other proceedings; (b) the impairment, limitation or modification of the liability of SG or the estate of SG in bankruptcy, or of any remedy for the enforcement of SG's liability under the Letter Agreement, resulting from the operation of any present or future provision of the federal bankruptcy laws or any other statute or from the decision of any court; (c) the rejection or cancellation of the Letter Agreement in any such proceeding; (d) the assignment or transfer of the Letter Agreement by SG; (e) any disability of SG; or (f) the cessation from any cause

1

whatsoever (other than due to a claim or defense available to SG by virtue of the Letter Agreement) of the liability of SG.

5.    <u>Subrogation</u>.  Until the full and punctual payment by SG to ZR of all sums due and owing to ZR pursuant to the terms, covenants and conditions of the paragraphs of the Letter Agreement entitled "ZR's Right to Terminate" or "Pursuit of Deposit," as the case may be, Guarantor (a) shall have no right of subrogation against SG by reason of any payments or acts of performance by Guarantor in compliance with the obligations of Guarantor hereunder: and (b) waives any right to enforce any remedy which Guarantor now or hereafter shall have against SG by reason of any one or more payments or acts of performance in compliance with the obligations of Guarantor hereunder.

6.    <u>Extension and Renewal</u>.  This Guaranty shall apply to the Letter Agreement, any extension or renewal term thereof, and to any holdover term following the term hereby granted or any extension or renewal thereof.

7.    <u>No Modification</u>.  This Guaranty may not be changed, modified, discharged or terminated orally or in any manner other than by an agreement in writing signed by Guarantor and ZR.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

2006 11:05AM   HP LASERJET 3200

IN WITNESS WHEREOF, Guarantor has executed this Guaranty on this 13th day of January, 2006.

John P. Conroy
Guarantor

# GUARANTY

THIS GUARANTY AGREEMENT is given this 16th day of January, 2006 by the undersigned (collectively whether one or more **"Guarantor"**) to Zapolski + Rudd, LLC, a North Carolina limited liability company (**"ZR"**).

WITNESSETH THAT:

As an inducement for ZR to enter into that certain Letter Agreement on January 16, 2006 between ZR and The Setai Group, LLC (**"SG"**) (the "Letter Agreement"); and

As a further inducement for ZR's performance under the Letter Agreement;

Guarantor agrees as follows:

1.    Guaranty. Guarantor unconditionally and irrevocably guarantees to ZR, and the successors and assigns of ZR, the full and punctual payment of all amounts due and owing to ZR by SG pursuant to the terms, covenants and conditions of the paragraphs of the Letter Agreement entitled "ZR's Right to Terminate" and "Pursuit of Deposit." Guarantor waives notice of any breach or default by SG. This Guaranty constitutes the primary obligation of the Guarantor, and ZR's ability to proceed against Guarantor hereunder is not conditioned upon ZR pursuing any remedy against SG or any other guarantor that may now or hereafter guaranty SG's obligations under the Letter Agreement.

2.    No Waiver by ZR. Any act of ZR, or the successors or assigns of ZR, consisting of a waiver of any of the terms or conditions of the Letter Agreement, or the giving of any consent to any manner or thing relating to the Letter Agreement, or the granting of any indulgences or extensions of time to SG, may be done without notices to Guarantor and without releasing the obligations of Guarantor hereunder.

3.    Effect of Security; Modification. The obligations of Guarantor hereunder shall not be released by ZR's receipt or release of security given for the performance and observance of covenants and conditions in the Letter Agreement contained on SG's part to be performed or observed, nor by any modification of such Letter Agreement; but in case of any such modification, the liability of Guarantor shall be deemed modified in accordance with the terms of any such modification of the Letter Agreement.

4.    Guarantor's Liability Unaffected. The liability of Guarantor shall in no way be affected by (a) the release or discharge of SG in any proceedings of creditors, receivership, bankruptcy or other proceedings; (b) the impairment, limitation or modification of the liability of SG or the estate of SG in bankruptcy, or of any remedy for the enforcement of SG's liability under the Letter Agreement, resulting from the operation of any present or future provision of the federal bankruptcy laws or any other statute or from the decision of any court; (c) the rejection or cancellation of the Letter Agreement in any such proceeding; (d) the assignment or transfer of the Letter Agreement by SG; (e) any disability of SG; or (f) the cessation from any cause

1

whatsoever (other than due to a claim or defense available to SG by virtue of the Letter Agreement) of the liability of SG.

5.    <u>Subrogation</u>.  Until the full and punctual payment by SG to ZR of all sums due and owing to ZR pursuant to the terms, covenants and conditions of the paragraphs of the Letter Agreement entitled "ZR's Right to Terminate" or "Pursuit of Deposit," as the case may be, Guarantor (a) shall have no right of subrogation against SG by reason of any payments or acts of performance by Guarantor in compliance with the obligations of Guarantor hereunder; and (b) waives any right to enforce any remedy which Guarantor now or hereafter shall have against SG by reason of any one or more payments or acts of performance in compliance with the obligations of Guarantor hereunder.

6.    <u>Extension and Renewal</u>.  This Guaranty shall apply to the Letter Agreement, any extension or renewal term thereof, and to any holdover term following the term hereby granted or any extension or renewal thereof.

7.    <u>No Modification</u>.  This Guaranty may not be changed, modified, discharged or terminated orally or in any manner other than by an agreement in writing signed by Guarantor and ZR.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

2

IN WITNESS WHEREOF, Guarantor has executed this Guaranty on this 16th day of February, 2006.

_____
Jonathan J. Breene
Guarantor

# ZAPOLSKI+RUDD, LLC

March 6, 2006

**VIA FACSIMILE
AND OVERNIGHT DELIVERY**

The Setai Group LLC
405 Lexington Avenue, 54th Floor
New York, NY 10174
Attn: Mr. John P. Conroy

> Re:     237 20th Street, 2000-2038 Collins Avenue and 220 21st Street, Miami
>         Beach, Miami-Dade County, Florida ("Property")

Dear Mr. Conroy:

This letter constitutes formal written notice from Zapolski + Rudd, LLC ("ZR"), to The Setai Group, LLC ("Setai"), of ZR's termination of its involvement in the acquisition and development of the Property. ZR is exercising its right of termination pursuant to the provisions of that certain Letter Agreement dated January 17, 2006 ("Letter Agreement"), between ZR and Setai. ZR requests that Setai provide ZR with timely information concerning whether Setai has elected to pursue a "Termination Decision" or a "Go Forward Decision" as those terms are defined in the Letter Agreement.

As provided in the Letter Agreement, a copy of this notice has been sent by overnight delivery service contemporaneously with this facsimile.

Very truly yours,

Jon Bowman
Zapolski + Rudd, LLC
Chief Operating Officer

cc:     John P. Conroy (via overnight delivery)
        Kevin Fallon (via overnight delivery)

# THE SETAI GROUP

May 22, 2006

Zapolski + Rudd, LLC
68 Coombs Street, Suite C1
P.O. Box 670
Napa, CA  94559
Attn: Todd Zapolski

> RE: 237 20th Street, 2000-2038 Collins Avenue and 220 21st Street, Miami
> Beach, Florida (the "Property")

Dear Todd:

Reference is made to (i) that certain Purchase and Sale Agreement (the "Purchase Agreement")
dated as of January 19, 2006 between POP Development, LLC, 4 B's Realty Collins Avenue,
LLC and Just Around The Corner, LLC, as sellers, ("Seller") and The Setai Group, LLC, as
purchaser, ("Setai") relating to the above referenced Property and (ii) that certain Letter
Agreement (the "Letter Agreement") dated as of January 17, 2006 between Setai and Zapolski +
Rudd, LLC ("Z+R").

As per our previous discussions, both Setai and Z+R have concluded that the failure of the
parties to the Purchase Agreement to execute the documents described in the Letter of Intent (as
defined in the Purchase Agreement) prior to March 20, 2006 was a failure of a condition to
closing under Section 8(h) of the Purchase Agreement, and that, as a result of such failure, the
First Deposit (as defined in the Purchase Agreement) is fully refundable. As noted in discussions
between Z+R and Seller and between Setai and Seller, Seller has taken the position that the First
Deposit is not fully refundable notwithstanding the express provisions of Section 8(h) of the
Purchase Agreement. The purpose of this letter is to set forth a course of action and a timetable
for Z+R and Setai to jointly pursue a refund of the First Deposit, which was deposited by Z+R
with Seller pursuant to the Letter Agreement.

As you know, Setai has been in discussions with numerous third parties (such parties, the
"Potential Purchasers") who may be interested in purchasing the Property from Seller – in effect
Setai has been trying to "broker" a transaction between Seller and such Potential Purchasers.
Setai believes that a transaction between Seller and a Potential Purchaser would enhance the
speed and likelihood of receiving a refund of the First Deposit because either (i) Setai could
negotiate a payment equal to the First Deposit from such Potential Purchaser or (ii) Setai could
place a lis pendens on the Property which would require Seller to refund the First Deposit prior
to closing a transaction with such Potential Purchaser (because Seller would have an obligation
to deliver lien-free title to the ultimate purchaser).

The letter sent to Seller on March 22, 2006 by our counsel, Leo Rose III, noted that a failure of a
condition to closing under the Purchase Agreement had occurred but did not demand a return of

the First Deposit at that time.  To date, Setai has not made a demand from Seller for a return of the First Deposit primarily because we believe that (i) to do so would hinder our ability to broker a transaction between Seller and a Potential Purchaser given the cordial relations we have so far had with Seller and (ii) our legal position with regard to the refundability of the First Deposit is not adversely affected by waiting to see the outcome of such brokering.

However, notwithstanding the foregoing, to date no Potential Purchaser has signed a legally binding agreement to purchase the Property and Setai recognizes that this cautious approach cannot go on forever.  At some point in the very near future, a demand will have to be made for a refund of the First Deposit and legal action will have to be taken to pursue that demand in the event Seller fails to refund it (which Seller has intimated it will not).  Our proposed timeline for such actions is as follows:

1. In the event that no Potential Purchaser has entered into an agreement to purchase the Property or entered into an agreement with Z+R to pay to Z+R an amount equal to the First Deposit prior to June 1, 2006, Setai will send a letter to Seller demanding a refund of the First Deposit in substantially the form previously provided to Z+R.

2. In the event that, prior to July 1, 2006, Seller has not refunded the First Deposit and none of the Agreements referred to in (1) above have been entered into, Setai will attempt to place a lis pendens on the Property and Setai and Z+R will jointly file a legal claim against Seller to seek a refund of the First Deposit.

We believe that the best way to secure a refund of the First Deposit is to have a Potential Purchaser consummate a transaction with Seller.  However, in the event that a Potential Purchaser does not ultimately pursue the transaction, we are prepared to proceed with the actions and the timeline set forth above.

As always, please feel free to call with any questions.


Regards,

The Setai Group, LLC


By: _____
Name: Kevin Fallon
Title:  Authorized Signatory

# ZAPOLSKI + RUDD, LLC
### REAL ESTATE INVESTMENT    DEVELOPMENT    MANAGEMENT

May 31, 2006

**VIA FACSIMILE**
**AND OVERNIGHT DELIVERY**

The Setai Group, LLC
405 Lexington Avenue, 54th Floor
New York, NY 10174
Attn: Mr. John P. Conroy

> Re:    237 20th Street, 2000-2038 Collins Avenue and 220 21st Street, Miami
> Beach, Miami-Dade County, Florida ("Property")

Dear Mr. Conroy:

We are in receipt of Kevin Fallon's correspondence dated May 22, 2006, concerning the status of both the Purchase Agreement between the Setai Group, LLC ("Setai"), and the Brodsky Group for the acquisition of the Property referenced above and the Letter Agreement between Zapolski + Rudd, LLC ("ZR") and Setai governing the return of ZR's deposit. While we appreciate the information provided by Mr. Fallon, his letter fails to acknowledge that Setai has not yet complied with the terms of the Letter Agreement.

Under the provisions of the Letter Agreement ZR has been entitled to payment from Setai in the amount of $500,000.00 since April 18, 2006. ZR has delivered written demands to Setai for payment on both April 10, 2006 and again on April 26, 2006, yet no payment has been forthcoming. ZR requests, yet again, that Setai remit these funds immediately.

Be advised that ZR continues to be willing to honor its obligations under the Letter Agreement and cooperate in the pursuit of the Brodsky Group in order to secure the return of as much of the First Deposit as possible. ZR expects Setai to honor all of its obligations under the Letter Agreement in a like manner, including the prompt payment to ZR of the outstanding sums that are due. Setai's immediate attention to this matter will be appreciated.

Sincerely,

Todd C. Zapolski

cc:    Jonathan J. Breene (via facsimile and overnight delivery)
       John P. Conroy (via facsimile and overnight delivery)

# THE SETAI GROUP

June 1, 2006

POP Development, LLC
4 B's Realty Collins Avenue, LLC
Just Around The Corner, LLC
c/o 4 B's Realty
26 Harbour Park Drive
Port Washington, NY 11050
Attn: Bert E. Brodsky and Kenneth Faltischek, Esq.

> RE: 237 20th Street, 2000-2038 Collins Avenue and 220 21st Street, Miami Beach, Florida (the "Property")

Ladies and Gentlemen:

Reference is made to that certain Purchase and Sale Agreement (the "Purchase Agreement") dated as of January 19, 2006 between POP Development, LLC, 4 B's Realty Collins Avenue, LLC and Just Around The Corner, LLC, as sellers, ("Seller") and The Setai Group, LLC, as purchaser, ("Purchaser") relating to the above referenced Property.

As was noted in the letter sent to you on March 22, 2006 by our counsel, Leo Rose III, the failure of the parties to the Purchase Agreement to execute the LOI Documents (as defined in the letter) prior to March 20, 2006 was a failure of a condition to closing under the Purchase Agreement that entitled Purchaser to a return of the First Deposit (as defined in the Purchase Agreement) pursuant to Section 3(a) thereof. At the time the letter was sent to you we did not demand a return of the First Deposit as the parties were continuing to work toward the successful consummation of the transaction despite the failure of the condition to closing.

Though the parties continue to work toward the consummation of this transaction, a substantial amount of time has passed and the transaction has not in fact been consummated. We therefore feel that at this time it would be imprudent not to formally demand a return of the First Deposit in writing, and this letter should serve as formal notice of our demand. While we remain committed to pursuing this transaction, we do require a return of the First Deposit as we continue to work toward a successful conclusion of the deal.

Please wire the funds comprising the First Deposit to Purchaser in accordance with the following wire instructions:

JP Morgan Chase
New York New York
Setai Group LLC
ABA# 021000021
Acct# 777491125

As always, feel free to call with any questions.

Regards,

The Setai Group, LLC

By: _____

Name: Kevin P. Fallon
Title:  Authorized Signatory


cc:     Zapolski + Rudd, LLC
        501 Washington Street
        Durham, NC 27701
        Attn: Mr. Todd Zapolski

        Leo Rose III, Esq.
        Schreeder, Wheeler & Flint LLP
        127 Peachtree Street, N.E.
        1600 Candler Building

        Herrick Feinstein LLP
        2 Park Avenue
        New York, NY 10016
        Attn: Jordan J. Metzger, Esq.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ZAPOLSKI / RUDD, LLC,

                                        Plaintiff,                06 Civ. 6353 (WHP)(AJP)

                        -against-                                **AFFIDAVIT IN SUPPORT OF
                                                                CONFESSION OF JUDGMENT**

THE SETAI GROUP, LLC, JOHN P. CONROY and
JONATHAN J. BREENE,

                                        Defendants.

STATE OF NEW YORK    )
                     ) SS:
COUNTY OF KINGS      )

      John P. Conroy, being duly sworn, deposes and says:

      1.    I reside at ___*1965 Broadway, Apt 8E NY NY 10023*___.

      2.    I am an officer and member of defendant The Setai Group, LLC, which is a Delaware Limited Liability Company.

      3.    I have the authority to execute this Affidavit in Support of Confession of Judgment on behalf of The Setai Group, LLC.

      4.    Pursuant to the terms of the Settlement Agreement between the parties to this action as set forth in the Court's Order, dated November 11, 2007 (Andrew J. Peck, Magistrate Judge), and the November 5, 2007 Settlement Conference Transcript, collectively attached as Exhibit A hereto (the "Settlement Agreement"), The Setai Group, LLC hereby confesses judgment in favor of plaintiff Zapolski/Rudd, LLC in the amount of $1,000,000, plus 9% interest on that amount from November 5, 2007 forward.

      5.    On behalf of The Setai Group, LLC, I hereby confess that the amounts set forth in Paragraph 4 above are justly due, and that Judgment may be entered by United States Magistrate

Judge Andrew J. Peck pursuant to 28 U.S.C. § 636(c), or such other Judge or Clerk as the Court

designates, in favor of Zapolski/Rudd, LLC and as against The Setai Group, LLC for the amount

of $1,000,000, plus 9% interest on that amount from November 5, 2007 forward, in addition to

any and all costs permitted by law.

_____
John P. Conroy

Sworn to before me this _5_ th day
of November, 2007

_____
Notary Public

ALESSANDRO PALAZZOLO
Notary Public, State of New York
No. 01PA6066214
Qualified in Richmond County
Commission Expires November 13, 20_09_

- 2 -

Zapolski/Rudd, LLC and as against me for the amount of $570,000, plus 9% interest on t

amount from November 5, 2007 forward, in addition to any and all costs permitted by la

_____
Jonathan J. Breene

Sworn to before me this 12th day
of November, 2007

_____
Notary Public

RONIT FEFER PEREZ
Notary Public - State of Flori
My Commission Expires Nov 3, 20
Commission # DD 368673
Bonded By National Notary Ass

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ZAPOLSKI / RUDD, LLC,                                                    06 Civ. 6353 (WHP)(AJ

                                    Plaintiff,

                     -against-                                          **AFFIDAVIT IN SUPP
                                                                        CONFESSION OF JU**

THE SETAI GROUP, LLC, JOHN P. CONROY and
JONATHAN J. BREENE,

                                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

STATE OF NEW YORK       )
                        ) SS:
COUNTY OF KINGS         )

        Jonathan J. Breene, being duly sworn, deposes and says:

        1.      I reside at _444 ഡ2. Rive Alto Dr. Miami Beach FL 33139_

        2.      Pursuant to the terms of the Settlement Agreement between the parties to th

action as set forth in the Court's Order, dated November 11, 2007 (Andrew J. Peck, Magis

Judge), and the November 5, 2007 Settlement Conference Transcript, collectively attached

Exhibit A hereto (the "Settlement Agreement"), I hereby confess judgment in favor of plai

Zapolski/Rudd, LLC in the amount of $570,000, plus 9% interest on that amount from

November 5, 2007 forward.

        3.      I am personally obligated to pay the amount of the judgment confessed purs

the terms of the Settlement Agreement.

        4.      I hereby confess that the amounts set forth in Paragraph 2 above are justly d

and that Judgment may be entered by United States Magistrate Judge Andrew J. Peck pursi

28 U.S.C. § 636(c), or such other Judge or Clerk as the Court designates, in favor of

DEC-10-200...

*Exhibit 10*
*12.10.07*
*RC*

Kevin Fallon Voicemail Transcription
Date:  Thurs 6/1/2006
Time:  7:08 pm

Hey Ken its Kevin Fallon from Setai Group.  Ah I don't know if John told you I think he did tell you that we were going to be sending you a letter today asking for a return of the deposit. Ahm just wanted to touch base with you letting you know that was coming.  And I'm sure John explained it to you that it you know not really so much from us as it is or at all from us as it is from ah Todd Z who is you know breathing down our necks and forcing us to send the letter because we are the party to the contract as is the case rather than having a jv that is a party to the contract so ahm we are sending that letter sort of on behalf of Todd so don't it the wrong way, but we sort of have to send it to prevent him from taking action against us so I'm going to fire that off by email now and I'll send it by hard copy as well.  But ah any question please do give me a call 212-9477747.  thanks.

Defendants' 1581

PLAINTIFF'S EX. ( 10 )
APRIL 14, 2008                    For I.D.
CASE NO. 06-20092 CA 01 (40)
HARVEY RUVIN, CLERK OF COURTS